[L. A. No. 14925.  In Bank.—March 21, 1935.]

A. S. WILCOX, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Edward L. Cotten for Petitioner.

Philbrick McCoy for Respondent.

SEAWELL, J.—Three separate notices to show cause why he should not be disciplined for alleged professional misconduct, based upon four specific charges, were issued and served upon the petitioner by the local administrative committee number two, returnable before the local administrative committee number nine, The State Bar of California, for hearing and decision, from which it concluded that petitioner's acts as disclosed at said hearings involved moral turpitude and dishonesty on his part within the meaning of subdivision 5, section 287, Code of Civil Procedure, and thereupon recommended, on April 30, 1934, that petitioner be permanently disbarred from the practice of law and that his name be stricken from the roll of attorneys of the state of California. Said notices were served January 3, 1934, March 1, 1934, and April 3, 1934, respectively. The acts charged as professional misconduct are alleged to have been committed in the latter part of 1932 and in the early part of 1933. The board of bar governors on May 18, 1934, upon proceedings had and taken by it and upon consideration of the findings, conclusion and recommendation of said local administrative committee number nine, consolidated said proceedings and approved and adopted the findings of fact

of said local administrative committee and recommended to this court that petitioner A. S. Wilcox be disbarred from the practice of the law in the state of California.

Petitioner now comes to this court on a petition for a writ of review, asking this court to disapprove of and annul by its order the recommendation made by said board that he be disbarred from the practice of the law in this state.

This is the second time petitioner has been before The State Bar on charges of professional misconduct. On July 21, 1931, he was suspended from the practice of the law for a period of one year on a charge of having converted the funds of a client to his own uses.

■ One of the charges preferred against him, L. A. No. 640, has to do with one Jennie Purnell, plaintiff in a personal injury action for the recovery of damages on account of injuries sustained in an automobile accident which occurred in 1931. On May 4, 1932, he was substituted as the attorney for said Jennie Purnell. His fee was to be one-third of any sum he might recover from the defendant, who was insured. He sought and obtained an offer of settlement with the insurance carrier in the sum of $2,100. His client was not willing to accept said sum, but upon his advice and suggestion that she would secure $1500 net and that petitioner would take care of the doctor's, nurse and hospital bills she consented to a settlement upon that basis. Petitioner agreed, beyond question, that all of said bills would be taken care of by him. He collected said $2,100 and paid her $1500. The doctor's bill was $195, the nurse's bill was $100, and the hospital bill was $29. Petitioner claims that when he made the agreement to pay said bills he understood that the doctor's bill would not exceed $50 and the nurse's bill would not exceed that amount. The evidence is conflicting on this point, but there can be no doubt, inasmuch as petitioner was preparing the case for trial and had been negotiating a settlement, that he well knew the amount of the doctor's and nurse's and hospital bills. Petitioner had been attempting to have the doctor and others reduce their bills, and it came to Mrs. Purnell's ears that the doctor might file a suit against her. She had no doubt been quite severely injured in the accident and was preparing to make a trip to Canada. She became uneasy about a suit being filed against her and she consulted petitioner

about the matter and he assured her that she should not worry as he would take care of the doctor's bills as well as others. Her testimony is explicit on the point that petitioner said that she was to have $1500 clear and he would make his fee out of the amount left after the payment of said bills. Shortly after she arrived in Canada petitioner informed her by letter that the doctor had filed suit against her and that he would take care of the matter. She returned in about seven weeks and learned that her automobile had been attached. The case was set for trial on a day certain, and petitioner was notified of the trial day. Mrs. Purnell heard nothing from petitioner, who was detained in jail upon a charge of conspiracy to defraud in a bankruptcy proceeding. The day before the case was set for trial the plaintiff's attorney received a letter from petitioner's wife requesting him to consent to a postponement as her husband could not be present on the day of trial. No reason was assigned as to his inability to attend the trial, and because of failure to state the reason of the inability of her husband to attend, the trial proceeded. Judgment went for plaintiff and the automobile was purchased at execution sale by plaintiff. At about this time the charge against petitioner in the federal court was dismissed and he was released from custody. He took no steps to appeal the case which he could have done had he acted in the matter. He subsequently moved to set aside the judgment, but he did not assign as one of the grounds therefor the fact that he was in jail on trial day and therefore was unable to be present. His motion was denied and the judgment became final. He assured Mrs. Purnell and her son, Roy Feeney, both before and after the sale that he would redeem the automobile and restore it to her. In a letter to the son, Roy Feeney, under date of July 8, 1932, petitioner wrote as follows: "Just as soon as this case is tried and the court makes its judgment the judgment will be immediately paid by me." This he failed to do. After some time had passed he paid the nurse $50 and later $25 in full of her demand. The hospital bill was not paid. He told Mrs. Purnell he had paid it. Mrs. Purnell brought an action against him for damages suffered by his negligence by reason of his failure to defend against the physician's suit and to carry out his agreements generally. She ob-

tained a judgment against him in the sum of $100, which remained unsatisfied at the time the bar actions herein were concluded.

For his services in transaction No. 640 petitioner received a fee of $600 and paid out $75 to the nurse. The hospital bill is still unpaid. Mrs. Purnell received $1500 in compensation for serious injuries sustained in the accident, lost her automobile and holds an unsatisfied judgment against petitioner for the sum of $100 and costs.

Petitioner failed to appear before the committee and defend against the complaint designated L. A. No. 653. By this accusation it is alleged that Nathan Cohn employed him to collect $17 owing to him by one Bettie Martz. His fee was on a fifty per cent basis. Two dollars were collected and petitioner advised his client that the debtor had offered to pay $10 in cash in full settlement of the account. The offer was accepted and said sum of $10 was collected by petitioner, who admitted to his client that he had used the money and was then unable to pay it but that he would remit very soon. Cohn made frequent demands upon him for his share of said collection, but petitioner did not account to Cohn for the same until after he became aware that Cohn had lodged a complaint against him with The State Bar. He then claimed that he had previously mailed Cohn's portion of the collection, $5 in cash, to him in an unregistered letter. He also failed to attend this hearing. In fact, he attended but one hearing of the several charges in which he was under investigation.

The second complaint included under L. A. No. 653 presented the following facts: In May, 1933, petitioner was retained by one N. W. Weidenheimer to collect the sum of $815.45 due him upon a promissory note executed by one Alvin K. Petersen. He was to receive for his services fifty per cent of any amount which he might collect. Petersen made an offer to pay the sum of $500 in full settlement of the indebtedness which amount was accepted by Weidenheimer upon the advice of petitioner. The terms of settlement were that Petersen was to pay down $175 and $50 per month with $25 as the last payment until paid in full. Petitioner remitted one-half of said $175 cash payment, and remitted one-half of the monthly installments until the full indebtedness remaining unpaid was $250. Petersen offered

to pay $175 in full of the balance due. This offer was accepted and Petersen paid to petitioner said $175. He used this money for his own purposes and did not inform his client of its receipt by him, but continued to pay Weidenheimer $25 per month, as though the original agreement was still in effect. Two checks for monthly payments of $25 each issued by petitioner to Weidenheimer were refused payment by the bank on which they were drawn on the grounds of insufficient funds in the account of petitioner. Weidenheimer thereupon learned of the unaccounted payment of $175 made to petitioner, of which he had received no part, and employed other counsel, who demanded all of the papers in the matter, none of which was delivered. A balance of some $45 is still due from petitioner to his client on account of this transaction.

The last transaction upon which complaint is made is L. A. No. 672. George Karp and his wife employed petitioner to collect damages arising out of an automobile collision. Petitioner's fee was to be one-third of any sum collected by him without suit. The claim was settled for the sum of $94. Petitioner contrived to have the check for settlement indorsed to himself, collected the money and used it for his own purposes. He made many promises to pay his clients their share, $62.66, and after much effort on their part he paid them $20 and no more.

The foregoing concludes a summary of the substance of the charges made by the accusers upon which the committee and board of bar governors recommend the disbarment of petitioner.

As above noted, petitioner failed to appear at any of said hearings held by the local administrative committee except the first hearing had, but did appear before the board of bar governors and made his defense before that body. In explanation of his failure to attend all of said committee hearings he testified that he had written to the local administrative committee, requesting a continuance until June as he was then engaged in teaching night school and was in need of the wage as a means of support of his wife and children. He claimed that many of his troubles were caused by mingling his client's funds with his personal funds. He testified that the refusal of the bank to pay the two $25 checks to Weidenheimer was caused by the delivery to him

of a check in the sum of $200 issued by one Lassiter, and deposited by him on November 15, 1933, with the Bank of America at Fourth and Spring Streets, Los Angeles, which was afterwards returned not paid for want of sufficient funds to the account of the drawer. He claims that the Weidenheimer checks were not presented promptly for payment and the shrinking of his account in the sum of $200 left his account insufficient to meet the payment of said checks, as he had drawn on the balance of his deposit in payment of rent and other bills. The petitioner testified that he explained to the persons complaining against him in every instance, the perplexing situation in which he found himself and that he tried for many weeks to borrow the money to make good each amount, but was unable to do so. He found it necessary to give up his law office and get a job of work. He finally found employment with the CWA teaching school two hours at night and working in the tax office (the official designation not appearing) in the daytime and made good the Weidenheimer checks not paid by reason of insufficient funds. That he had made a number of payments in an attempt to restore to his clients all the funds which he had improperly used, there is no doubt. His salary for teaching night school was $22 per week.

Petitioner is now approximately thirty-five years of age and has a wife and two children. That he had experienced trying difficulties in his effort to support himself and family by the practice of the law very clearly appears from the record before us.

We feel quite certain that he advised Mrs. Purnell to settle her claim for $2,100 and that he agreed with her that he would accept $600 and pay the doctor's bill, the nurse's claim and the hospital bill. We are equally sure from the evidence that there was good reason for him to believe that the doctor's charge was to be reduced, and that it would have been reduced had Mrs. Purnell been solely liable therefor rather than jointly with the insurance company. The testimony of the nurse and the doctor himself sufficiently indicates that there was reason for petitioner to believe that the doctor's bill was open for settlement for a sum much less than the amount allowed on the default judgment. But this circumstance did not relieve him of performing his full duty to Mrs. Purnell and protecting her from the damage

which resulted by his failure to perform his part of the bargain.

We are not disposed to denounce petitioner as being an inherently dishonest man. Like too many others whose error we have been called upon to adjudge, he yielded to the grim economic distress which stalked his own household and made use of funds which should have been turned into the hands of his clients. It is written in such cases that to do so is a serious violation of an attorney's trust. Once before, it would seem, petitioner similarly misstepped. The particular facts of that case are not before us and we have no knowledge as to the degree of moral turpitude they may have disclosed. The disbarment of an attorney, which means the denial of his right to practice law in this state is a grave matter, as it places an indelible stain upon the name of the disbarred lawyer which affects him generally as a citizen. Once disbarred, experience teaches us that the barrier which is thereby raised becomes almost insuperable to reinstatement. Therefore the court should and does exercise much care in making an order of disbarment. We have examined this record in the light of all that has been said in the premises and conclude that "moral turpitude" as defined in bar matters embraces a number of the acts charged against petitioner which have been herein discussed.

Upon the case presented there seems to be no alternative by which the acts of petitioner may be condoned.

It is therefore the order of the court that he be disbarred from the practice of law in all the courts of this state and that his name be stricken from the roll of attorneys of this state.

Langdon, J., Preston, J., Waste, C. J., Shenk, J., Curtis, J., and Thompson, J., concurred.