[S. F. No. 16189. In Bank.—November 13, 1939.]

ARCHIBALD CANE, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

[S. F. No. 16297. In Bank.—November 13, 1939.]

ARCHIBALD CANE, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Archibald Cane, *in pro. per.,* for Petitioner.

Philbrick McCoy for Respondent.

THE COURT.—By separate proceedings, the petitioner seeks to review two recommendations of the Board of Governors of the State Bar of California that he be disbarred from practicing law in this state. The first recommendation is the result of disciplinary proceedings instituted against the petitioner in April, 1937. In the latter part of

June of that year, petitioner was adjudged insane and committed to a state hospital. Later, pursuant to the rules of procedure of the State Bar, this court entered an order suspending him from practice and staying the proceedings with reference to the board's recommendation until the further order of the court.

In June, 1938, the petitioner was discharged from the hospital upon the ground that he had recovered and in October of that year the stay of disciplinary proceedings was terminated. Thereafter, he filed in this court the application numbered S. F. 16189 to review the recommendations of the board of governors. In September, 1938, the State Bar instituted further disciplinary proceedings against the petitioner relating to additional transactions that had occurred prior to the time of his commitment to the asylum. This resulted in a second recommendation of disbarment by the board of governors which is now before the court for review in the proceeding numbered S. F. 16297.

The facts upon which the board of governors' recommendations are based are largely undisputed. On October 15, 1929, petitioner, who is now 34 years of age, after examination was admitted to practice law in this state. For several years he was employed on a salary basis by the San Francisco Legal Aid Society. In so far as the record shows, his difficulties began early in 1935 when he commenced misappropriating the funds of his clients. For one of these occurrences he was suspended from practice for a period of 30 days upon the recommendation of the board of governors.

The transaction for which the board first recommended disbarment arose out of a divorce action in which the petitioner had been employed as attorney for the wife. In December, 1935, the wife, who was then in Switzerland, wrote petitioner asking him to collect and forward the money due her under the divorce decree. In June and July of 1936, the petitioner collected a total of $298 from the husband, who requested petitioner to hold it until he could make a further payment so that the entire sum could be sent at one time. However, the husband sent the next payment direct to his wife in Switzerland and then learned some six months later that no part of the $298 had been forwarded to the wife. Petitioner claims that he was entitled to deduct

a fee for his collection services from these funds but admits that he never communicated with the wife after receiving the money. During a period of several months, the Swiss Consul at San Francisco unsuccessfully endeavored to obtain the money from the petitioner, and the client's claim was finally settled, after charges had been filed with the State Bar, upon the payment of $200.

The second disciplinary proceeding relates to the affairs of some eight clients. It appears that the petitioner accepted $90 from two persons as a fee and costs to qualify them as business partners under a fictitious name. He failed to perform these services, co-mingled the money with his own and retained it for his own use and purposes. Another client employed him to bring an action to annul her marriage and paid him $40 toward fees and costs. He failed to take any action for her other than to file a complaint and retained this money also. The petitioner was employed by three other clients to institute divorce suits in their behalf and was paid a total of $110 on account of costs and fees. In each case he failed to take any action whatsoever but used the money for his own needs.

The record further shows that the petitioner was employed in a certain guardianship proceeding in connection with which his client paid him $135. Of this he claimed $50 on account of fees and spent $53 for costs, leaving $32 unaccounted for. He also received $600.52 from the sale of certain property involved in these proceedings, and of this sum he admittedly appropriated all except $80. Also, during this period he received and failed to account for $400.19 which he had received as special administrator of the estate of a deceased person. This defalcation was later made good by the surety on the petitioner's bond, to whom he is still indebted for the amount paid.

In November, 1936, the petitioner obtained an award by the Industrial Accident Commission in behalf of another client in the sum of $688.61 including an allowance of $65 on account of attorney's fee. Pursuant to a written authority from his client, he collected the amount of the award and retained almost $500 of it as a loan from the client. This loan was purportedly made in consideration of the petitioner's agreement to waive the fee awarded him. However, the local investigating committee and the board of

governors found that this agreement was obtained upon petitioner's false representation to the client that the fee awarded him was insufficient and that if the client did not make the loan, petitioner would sue him in the civil courts for 50 per cent of the award and would doubtless recover that amount. Although petitioner denied making any such representation, the testimony of the client substantially supports the findings.

Another instance of misappropriating client's funds, which occurred in 1937, was not included in the State Bar's charges against petitioner but resulted in an indictment against him for grand theft. He stood trial upon this charge after his release from the asylum and was found guilty but was acquitted upon a hearing of the further plea of "not guilty by reason of insanity". A transcript of that hearing, containing testimony concerning petitioner's mental condition given by two psychiatrists appointed by the court, was received in evidence in the disciplinary proceedings.

■ It is evident that the facts proved against petitioner show a clear violation of the rules of professional conduct and, standing alone, would fully justify the conclusion of the board of governors that the petitioner should be disbarred. (*Mauer* v. *State Bar*, 219 Cal. 271 [26 Pac. (2d) 14]; *Marsh* v. *State Bar*, 2 Cal. (2d) 75 [39 Pac. (2d) 403]; *Wilcox* v. *State Bar*, 2 Cal. (2d) 614 [42 Pac. (2d) 631]; *Mills* v. *State Bar*, 6 Cal. (2d) 565 [58 Pac. (2d) 1273]; *Kennedy* v. *State Bar*, 13 Cal. (2d) 236 [88 Pac. (2d) 920].) Petitioner urges, however, that the findings and recommendations are not justified because, during the period within which the acts complained of were committed, he was under the mental disability which resulted in his being adjudged insane in June, 1937. He contends further that the evidence shows that he is now completely normal and has rehabilitated himself during the period of 27 or more months that he has refrained from practicing law and that "to disbar him because of misconduct during the period when he was incapable of exercising his normal judgment and discretion would . . . be penalizing him unjustly. . . . "

Three psychiatrists testified concerning the petitioner's mental condition at the time he committed the acts complained of. Two who appeared on behalf of the petitioner

agreed that he had been suffering from the manic-depressive type of insanity; one of them explained that individuals so afflicted "are fully alive to the nature of the things they are doing and the consequences of their acts . . . but they are emotionally in such a state that they can't control those things".

The third physician, who was consulted by the local administrative committee of the State Bar, stated that some of the petitioner's deviations "were certainly the result of conscious processes, dictated by urgent necessity, especially where financial difficulties were concerned . . . " and that "there were other situations in which morality, as such, did not enter, and in which he could exercise no conscious control of his actions." This doctor was of the further opinion that petitioner "would not be able to handle himself in any better manner than he has in the past, because he still shows marked emotional instability and only fair insight" and in view of this fact he did not believe that it would be safe for the petitioner in the interest of society to continue the practice of law.

It is clear that there is substantial support in this evidence for the finding of the local administrative committee that the petitioner was not incompetent during the period when his transgressions occurred. Undoubtedly, as stated by Dr. Wolfsohn, the petitioner's acts were dictated by urgent financial necessity. ▮ But neither necessity nor misfortune is a defense to the attorney who uses the money of his clients.

It is, therefore, ordered that the petitioner be disbarred from the practice of the law in this state and that his name be stricken from the roll of attorneys.