[S. F. No. 20494. In Bank. Jan. 6, 1961.]

ROBERT E. HATCH, Petitioner, v. THE STATE BAR OF
CALIFORNIA, Respondent.

Robert E. Hatch, in pro. per., for Petitioner.

John J. Goldberg for Respondent.

THE COURT.—This is a proceeding to review the recommendation of the Board of Governors of The State Bar of California (hereinafter referred to as "the board") that petitioner be suspended from the practice of law for a period of one year.

The board found (1) that on or about November 19, 1953, petitioner and Lucille F. Athearn entered into an attorneys' retainer agreement with Gladyce C. Merola, and that there-

after, pursuant to said agreement, petitioner collected certain assets in which Mrs. Merola had an interest and commingled them with his own assets by placing them in the International Investment Co., Inc. (hereinafter referred to as "the corporation"), wholly controlled by him, and failed and refused to account to Mrs. Merola for the receipt of the assets, and (2) that petitioner, pursuant to the retainer agreement, proceeded to collect, or caused to be collected, certain assets heretofore mentioned and appropriated and converted the same to his personal use and benefit without the knowledge and consent of Gladyce C. Merola.

*Petitioner's sole contention is that the evidence does not support the foregoing findings.*

This contention is devoid of merit.  ▇▇▇  The burden is upon one seeking a review of a recommendation of the board to show that its findings are not supported by the evidence or that its recommendation is erroneous or unlawful. (*Sturr* v. *State Bar*, 52 Cal.2d 125, 127 [2] [338 P.2d 897].)

▇▇▇  In the present case, not only has petitioner failed to meet the requirements of the foregoing rule, but the record discloses that the findings of the board are fully sustained by the evidence.

Following the death of Mrs. Merola's husband, the judge of the probate court in which the administration of his estate was pending ordered Mrs. Merola to deliver certain assets to the executor. Because of this order, Mrs. Merola and Mrs. Athearn, who was representing her, became concerned and for that reason associated petitioner.

Petitioner agreed to be associated with Mrs. Athearn as an attorney for Mrs. Merola but only on a contingent fee basis. He thereupon prepared the retainer agreement. It provides for a fee of 25 per cent of whatever is recovered or received by Mrs. Merola or it is determined that she owns and is entitled to retain. The agreement was executed on November 19, 1953.

The attorneys thereafter filed the following complaints in the superior court in San Francisco: (1) on November 19, 1953, a complaint to quiet title by Mrs. Merola against the executor of the will of Mr. Merola and E. F. Hutton & Company, with whom a securities account had been established by Mr. and Mrs. Merola; (2) on December 22, 1953, a complaint by Mrs. Merola against California Western States Life Insurance Company on a policy of life insurance on the life of Mr. Merola in the face amount of $26,000, the beneficiary

of which was Mrs. Merola; and (3) on November 29, 1954, a second complaint to quiet title by Mrs. Merola and the corporation against the executor of the will of Mr. Merola, covering shares of stock which had not been included in the property covered by the first quiet title action.

The first quiet title action resulted in a judgment rendered November 10, 1954, quieting the title of Mrs. Merola to (a) the E. F. Hutton & Company account, which was found to be in joint tenancy with right of survivorship, and to the securities therein contained, subject to the indebtedness against the account, (b) most of the other securities claimed in the complaint, (c) a cashier's check issued by the Bank of America October 13, 1953, payable to Mrs. Merola in the amount of $4,285.29, and (d) $17,065.04 of the amounts contained in four savings and loan association accounts, the balance thereof to the executor, and certain United States Treasury bonds to the executor.

On July 2, 1954, several months before the above-mentioned judgment was rendered, Mrs. Merola, on petitioner's recommendation, transferred certain assets to the corporation to be held by it as part of a trust then established. Included in the assets so transferred was the cashier's check for $4,285.29 above referred to.

One of the reasons given Mrs. Merola by petitioner in persuading her to transfer the assets to the corporation was that she had lost certain assets and improvidently converted some to her own use, placing her "in a very dangerous civil and criminal position" if she should later be required to account to the court for such assets.

Nevertheless, on July 6, 1954, four days after receiving the check as trustee and while said quiet title action was still in litigation, the corporation cashed the check. On the same day, although the proceeds thereof constituted the only Merola funds held by the corporation, petitioner caused it to pay to Mrs. Athearn on account of fees the sum of $857.15, and also caused it to pay the sum of $857.15 to him on account of fees.

The next receipt of Merola funds by the corporation was on July 30, 1954. The action on the life insurance policy had terminated in a judgment in favor of Mrs. Merola on July 23, 1954, for the sum of $24,752.54, which sum had been deposited by the insurance company with the clerk of the court on March 11, 1954, and was paid by the clerk to the attorneys on the day the judgment was rendered. On July 30, 1954,

this sum was paid over to the corporation, and two days later, on August 1, 1954, petitioner caused the corporation to pay to Mrs. Athearn and petitioner, in equal shares on account of fees, an aggregate of $9,901, more than 40 per cent of such judgment proceeds.

On October 13, 1954, the corporation received $2,000 in redemption of United States bonds which were the subject of the first quiet title action.

On October 26, 1954, prior to the receipt of any further Merola funds, except small sums as dividends on securities in litigation, petitioner caused the corporation to pay to Mrs. Athearn on account of fees the sum of $400 in one amount and the sum of $5,000 in another amount, and on November 1, 1954, petitioner caused the corporation to pay to himself on account of fees the sum of $5,400.

On November 15, 1954, the corporation received, in pursuance of the quiet title judgment hereinabove mentioned, Mrs. Merola's adjudicated share of Mr. Merola's savings and loan accounts in the sum of $17,065.04. On December 8, 1954, prior to receipt by the corporation of any further Merola funds, petitioner caused the corporation to pay to Mrs. Athearn the sum of $1,292.35 on account of fees and a like sum on account of fees to himself.

The only substantial sum thereafter received by the corporation during 1954 for the account of Mrs. Merola was $5,485.69, withdrawn from a joint tenancy savings account with Hibernia Bank, title to which had been quieted in the first quiet title action.

In the second quiet title action, the executor filed disclaimers on December 15, 1954, pursuant to which the court on February 10, 1955, rendered judgment in favor of Mrs. Merola and International Investment Co., Inc.

Including dividends on Merola securities, the corporation during 1954 received a total in cash for the account of Mrs. Merola of $56,121.91. The aggregate of fees which petitioner caused to be paid to Mrs. Athearn and himself during 1954 was $25,000.

A statement of receipts and disbursements of the corporation in 1954 for the account of Mrs. Merola was furnished to Mrs. Merola early in 1955. It specifies the date of each receipt of funds and of each disbursement for the personal account of Mrs. Merola. Disbursements for the litigation account of Mrs. Merola are not dated. They show aggregate reimbursements to Mrs. Athearn and petitioner for sums ad-

vanced by them and two sums of $12,500 each paid to Mrs. Athearn and petitioner. Neither the separate amounts making up such aggregate of $12,500 each nor the dates on which such amounts were paid are shown. A similar statement of receipts and disbursements was furnished by the corporation to Mrs. Merola following the end of each year for 1955, 1956 and 1957.

For all years mentioned, Merola funds received by the corporation aggregated $63,268.54. From this sum disbursements for litigation (exclusive of attorneys' fees), income taxes and personal needs of Mrs. Merola aggregated $29,055.75. At the end of 1957 the corporation was holding in the Merola account, according to its own figures, $9,212.79 out of the aforesaid total of $63,268.54.

Under the original retainer agreement, according to both petitioner and Mrs. Athearn, they were not entitled to compensation for services until there was a final accounting of the results obtained from their services.

On July 2, 1954, petitioner worked out a "new deal" with Mrs. Merola. He told her that it was for her own protection. Petitioner himself testified: "I told her that the International Investment Co. was available for the purpose of furnishing that security and safety which was not resident with her. And, secondly, that I personally was concerned, because if she either deliberately or unintentionally disposed of these things when it came to the final accounting with the attorneys, I wasn't going to be able to get my share that was due me. So, I stated that I felt that she should turn these over to the International Investment Co. *to see that she and Mrs. Athearn and I all were suitably protected, that our rights would have to be determined, which might be years in the future, but that the securities and assets would be available at that time.* So, she stated that she was willing to do so if that was my recommendation. Consequently, that was what was done." (Italics added.)

In testifying before the board, petitioner stated: "I said the International was available to hold this as an accommodation to her if she wanted to. She says, *'I trust you. I will do anything you say.'* " (Italics added.)

When petitioner was asked as to the terms of the trust that was being created by the transfer of Merola assets to the corporation, he testified: "I would say that there were no terms beyond that. A simple trust. It didn't require, in my opinion, any terms. The trustee, under primary rules, would have to account to her in the long run, and was merely acting

as bailee of the securities in the meantime. . . Q. So I can get it clear, it is your statement to us that International Investment Co. was availed of on behalf of Mrs. Merola for the purpose of collecting her assets, *maintaining them and controlling them, so that at the proper time and place accountings could be made to a court and to yourself and Mrs. Athearn with respect to fees and that accountings would then be made to Mrs. Merola?* A. That's correct. . . .

"Q. Could you tell us what is the nature of the 'new deal'? A. Yes. My understanding with Mrs. Merola was specifically this—that in turning over the assets to International Investment Co., that I was to be vested with discretion to do what I thought was best for our mutual interest in respect to those assets. Now, that includes securities, money and lawsuits. She assigned all the lawsuits to the International Investment Co. at the time it was contemplated. Also, she was going to turn the Hutton Account into International Investment Co. subject to the same arrangement. That she and, I think, Mrs. Athearn had full faith in me and satisfied to leave me in charge. And that's what I call the 'new deal.' That did not change the percentage to which we were entitled or to any other fees, but did change radically the handling of the assets. You see, up to that time, I had no control over any of these things. Q. And after this time you did have control over them? A. *I had complete control.* . . . I remember the foundation to this arrangement was in July. Naturally, I couldn't say to the woman, 'You are drunk,' all the time. I couldn't say that to her very graciously, but *I could say to her and she agreed that she needed help. She needed protection.* And about all that could be said on it is that I said, 'I think the best for you and for everybody is that you get these things out of your hands, turn them over and you can use the International Investment Co. and *I will be responsible for it and I will look after you the best I can.* . . .

"Q. Did it [the new arrangement] have anything to do with the time of payment to yourself and to Mrs. Athearn of fees? A. Well, let's see how I would accurately answer that. The Attorneys' Contract made no stipulation on that subject; therefore, it would be a matter of legal conclusion incident to the terms of it, and I have expressed my opinion that that would mean the final conclusions. Now, following this July arrangement, it did permit Mrs. Merola and the attorneys drawing on account subject to the final determination. I think that's the most accurate I can answer it.

"Q. *You had conversations with Mrs. Merola and told her you and Mrs. Athearn wished permission to draw fees on account?* A. *No. When she turned it over to me in July, it was up to me to determine what was to be done with everything, and I was given carte blanche.* Under that arrangement, I did not understand that she expected me to or that I was in any way obligated to ask permission. I was in a peculiar situation. If she said she wanted $10,000, I wouldn't give it to her. That was the extent of my understanding. *I said there was no discussion. She just turned everything over to me and I was to look after it.*

"The Chairman: Mr. Hatch, when she turned everything over to you and you were to look after it, that was turning it over to International Investment Co. Is that right? The Witness: Pretty much so. I can only tell you what actually was done. I said if she turned it over to International Investment Co. I would be responsible for the handling." (Italics added.)

On the same subject Mrs. Merola testified: "Q. [By petitioner] : Do you recall when you first started to turn things over to the International Investment Co. that there were any expressions of any restrictions upon how the money should be expended? A. *My understanding of the situation was that you were doing it for my own good so that the bonds and stocks would be in safe hands—also the cash.* Q. All right and fairly stated. You also understood that I was to have discretion in the handling of the funds—paying bills of yours and such things as those? A. But the bills were an infinitesimal amount. Q. You understood that I was to pay the bills if and when they came in as I saw fit? A. Well, I know you paid some small bills, but very small ones. Q. You didn't express any dissatisfaction with my doing that? A. No.

"Q. . . . There was no statement by you or me that I was to be limited in my authority to deal with the funds, was there? A. Well, that wasn't my understanding, but I could have been wrong. Q. You don't recall that at any time there was any statement on my part that I was not going to draw on these funds or any statement on your part that I should not draw on these funds without your specific authorization? Do you recall anything of that sort? A. No." (Italics added.)

As to the physical condition of Mrs. Merola at the time petitioner asked her to turn her assets over to the corporation and her need for help and guidance with respect thereto, petitioner testified: "Q. You felt during this period in 1954 that

134

her physical condition was such that she needed help constantly and guidance with respect to her assets? A. That's an understatement if I ever heard one. She certainly did. Levey and Stanley went before Judge Fitzpatrick and said they were going to move to have a guardian appointed for the woman, and they had appointed a doctor in Los Angeles to examine her and the doctor reported back and it got into the newspapers here that the woman was incompetent. And he based that testimony, and he didn't see her, on talking to Dr. Cherry, who was Mrs. Merola's Heart Specialist. I went down and talked to him and he was very upset about it and said she was not incompetent, but at times she was very good and at times she was very bad. During all of this time I felt that I was sitting in a dangerous position, because *I was trying to look after a woman who had the highest need of protection* and I never knew when one of these things was going to boomerang and hit me.'' (Italics added.)

Petitioner made a similar statement to the board: ''It was obvious that if I did not step in and protect her against her own follies, when she was drinking, that she would not be able to account to the court in the final and long run. *I acted as her guardian. . . .*'' (Italics added.)

As to whether the attorneys were entitled to be paid for services before the final accounting with Mrs. Merola under the retainer agreement and as to whether that was altered by the ''new deal,'' petitioner testified as follows: ''Mr. Fitz-gerald: Your interpretation of it was that you couldn't properly pay yourself on account? The Witness: Which is the underlying agreement. Mr. Fitzgerald: The November 19th agreement says nothing about time. The Witness: I hadn't thought about it before this afternoon, but I'm prepared to answer that I'm satisfied we could not touch any of the assets. Mr. Fitzgerald: Until the final wind up? The Witness: Until Mrs. Merola paid us. She had possession of the assets. We did not have the physical ability to do so, and I would say if I had possession of them—well, supposing that this judgment—the check had been payable to me as attorney for her, *I would feel that I had no right to take any part of it until it had been cleared with her so far as the original underlying agreement is concerned.*

''Mr. Fitzgerald: That is altered in your mind by the fact you had this so called 'new deal' arrangement with her in the early part of July, and you take that as authority given by her to you to use your discretion to prepay, if you will, or pay in

advance some part of the attorneys' compensation. THE WIT-
NESS: Yes, or anything else I thought was proper. You see, a
long list of her bills I paid without consulting her. MR. FITZ-
GERALD: All I was trying to clear up was that *under the No-
vember 19th agreement you did not feel that you could pay
yourself in advance, and, in fact, you couldn't.* THE WITNESS:
*I had no legal and, as a matter of fact, no physical ability to
pay myself.*" (Italics added.)

Mrs. Merola testified that she never authorized the payment
of $12,500 each to petitioner or Mrs. Athearn. It was her
understanding that a fee was to be collected "when and if the
case was settled . . . and not before."

After Mrs. Merola turned over her assets to the corporation,
she expressed dissatisfaction to petitioner on a number of
occasions, including doubt as to the accuracy or propriety of
the accountings rendered by the corporation.

Petitioner testified that he did not send any statement or
bill to Mrs. Merola or advise her he was going to pay the
money to Mrs. Athearn and himself before he paid it, nor did
he notify Mrs. Merola thereof when she and her friend, Mrs.
King, were in his office in December of 1954. He testified:
"That was part of the original deal with her. *She was satis-
fied to let me run the show.*" (Italics added.)

Petitioner testified that the amounts of the fees were known
to Mrs. Merola "and drawn with her consent," but later he
testified that it is possibly correct she did not know of the
payment of the fees until she received the 1954 accounting
sometime early in 1955.

In the hearing before the board, petitioner again stated,
without apparent foundation and in contradiction of his own
prior testimony: "Now I did receive this money from Mrs.
Merola's funds with her consent and knowledge at the time it
was drawn. That is all. BOARD MEMBER LONERGAN: Does the
record so show? PETITIONER: It shows that without dispute."

Petitioner further testified that the corporation was started
by him originally to give an income to his father and son and
is now used on quite a large scale for friends and clients having
large amounts of money and large amounts of property "the
same as when people turn title into a title insurance company
as trustee. It is a trustee corporation." The listed office is his
office, his son is the president, his nephew is the vice president,
and the lady in his office is the secretary. He further testified
that he controls the corporation and directs the issuance of

checks, deposits and disbursements of money although the checks are signed by his son and secretary.

When Mrs. Merola's securities were turned over to the corporation, they were transferred into the corporation's name without designating it as a trustee. The money was deposited in the corporation's bank account.

The Merola securities transferred to the corporation were in turn deposited with Elworthy & Co., securities brokers, to be transferred into the name of the corporation. Elworthy & Co. accepted instructions for the transfer and delivery of these shares signed by petitioner in his individual capacity without purporting to act on behalf of the corporation.

The corporation holds money and real estate of other persons, including a shopping center and unimproved land that is being subdivided. Some of the funds on hand are used to pay taxes and the operating expenses of the property, "and there is a lot of litigation going on and things of that sort." The corporation lends money at interest, the transactions being handled by petitioner. The income goes to the corporation. Mrs. Merola "is entitled to the same interest rate as the rest."

Petitioner stated that Mrs. Merola's funds were "used in the same fashion, identically" and "she is entitled to the [interest]." Nevertheless, the annual accounts of receipts and disbursements rendered to Mrs. Merola do not reflect any interest paid or credited to Mrs. Merola. There is no other evidence that such interest was paid to her. Other depositors of funds with the corporation "draw the interest as they go."

Petitioner testified that he is in effect the corporation and that he so advised Mrs. Merola. When she asked him, "Who is the International Investment Co.?" he said, "I am."

As to the nature of petitioner's and Mrs. Athearn's interest in the Merola assets, petitioner testified: "[W]e are entitled to an interest in the assets themselves either received, recovered by her or determined that she owns . . . Mrs. Athearn and I have a vested 25 per cent interest in the securities themselves. . . . [W]e are entitled to division, in kind, so far as the securities are concerned."

Petitioner testified that the fees taken in 1954 were not 25 per cent. He did not know whether the total was more or less. A statement of attorneys' fees on the basis of the amount recovered in 1954 was never presented to Mrs. Merola. No bill was presented by petitioner or Mrs. Athearn to the corporation for the fees paid to them, and no receipt was given

other than the cancelled checks. The attorneys never rendered an accounting to Mrs. Merola. The amount of $12,500 paid to each attorney ''was just taken as a rough amount as payment on account.''

As to the percentage of cash appropriated as fees, in relation to total cash received, petitioner testified that by December 1954 ''. . . we knew that we were safe on the securities —the Hutton Account and all. *It was obvious it was more than twenty-five per cent of the cash that had been taken in by us,* but I dare say if you add Mrs. Merola's cash that she has taken in, it would be less than twenty-five per cent. *I don't know though.*'' (Italics added.)

Mrs. Athearn testified that she never had a conversation with Mrs. Merola in which she or Mr. Hatch told Mrs. Merola that there would be a partial distribution of the properties being held in her account, so that Mr. Hatch could receive a fee before final determination of the property interests in the estate, nor did she have a conversation with petitioner concerning a partial fee payment before such final determination. It was Mrs. Athearn's understanding of the retainer agreement that the attorneys were to receive 25 per cent of each and every piece of property that was determined to belong to Mrs. Merola.

Mrs. Athearn further testified that her understanding at the time of the hearing was that determination of the fee of Mr. Hatch and herself would be when every phase of the litigation was finally settled, including determination of inheritance and estate taxes. These taxes had not been settled by the end of 1954. The taxes were to be deducted from the assets recovered before the 25 per cent fee was computed.

Neither the ledger of the corporation nor the balance sheet reflected Mrs. Merola's securities. Petitioner admitted that there was never a definitive list in one place of the securities which the corporation was holding in which Mrs. Merola had an interest. Nothing would show an inventory of her securities except the receipts given her.

Mrs. Merola, her subsequent attorney, Edythe Jacobs, and petitioner all testified that from time to time an accounting was requested of petitioner of the assets held by the corporation for Mrs. Merola and that the requests were either ignored or refused.

Petitioner refused to give Miss Jacobs an accounting, because he could not get one from her in connection with the Hutton account. He refused to give her an inventory of

the assets on the ground that Mrs. Merola had receipts for them and he had never been told that they had been lost or could not be found.

Miss Jacobs on several occasions asked for copies of the receipts which petitioner stated had been given to Mrs. Merola, but she was never able to obtain them. She felt that the annual accounts rendered by the corporation to Mrs. Merola were incomplete.

All demands by Miss Jacobs for accountings were made on petitioner or Mrs. Athearn, not on the corporation. Petitioner told Miss Jacobs that if she wished an accounting, she should go to court.

Petitioner's own testimony establishes that the corporation was his tool with which he could do as he pleased. It was clearly his *alter ego*. (*Cf. Alkow* v. *State Bar*, 38 Cal.2d 257, 262 [3] [239 P.2d 871].)

The record discloses that petitioner commingled his client's funds with his own and also misappropriated his client's funds and converted the same to his personal use and benefit without the knowledge of his client.

It is ordered that petitioner be suspended from the practice of law in this state for a period of one year, commencing 30 days after the date of filing of this order.

Tobriner, J. pro tem.,* participated in place of Peters, J., who deemed himself disqualified.

Petitioner's application for a rehearing was denied January 31, 1961. Tobriner, J. pro tem.,* participated therein in place of Peters, J., who deemed himself disqualified.

---

*Assigned by Chairman of Judicial Council.