[L. A. Nos. 27040, 27041. In Bank. June 13, 1963.]

WILLIAM JOHN HYLAND III, Petitioner, v. THE STATE
BAR OF CALIFORNIA, Respondent.

William John Hyland III, in pro. per., and Edward B. Stanton for Petitioner.

Garrett H. Elmore and Karan F. Minick for Respondent.

THE COURT.—In two proceedings before local administrative committees of the State Bar (for Los Angeles County) petitioner was found guilty of four counts of professional misconduct. In both proceedings the Board of Governors of the State Bar adopted, with minor modifications, the findings of the local committees and recommended disbarment.

██ Petitioner seeks review of both proceedings. He contends, without elaboration, that the ''recommendations and findings of the Board of Governors were based upon insufficient evidence and are contrary to law.'' This unsupported allegation does not fulfill the requirements of rule 59(a) of the California Rules of Court* and does not sustain petitioner's burden of showing that the action of the Board of Governors is erroneous or unlawful. (Bus. & Prof. Code, § 6083; *Hatch* v. *State Bar*, 55 Cal.2d 127, 128 [9 Cal.Rptr. 808, 357 P.2d 1064].) Moreover, we have reviewed the record and found that the board's findings and recommendations are sustained by the evidence.

Petitioner graduated from the University of Pennsylvania and from Harvard Law School, and was admitted to practice in California in 1952. The transactions that led to these proceedings occurred between 1954 and 1959.

██ The first matter involves petitioner's representation of Mrs. Hazel D. Hahn, a 61-year-old widow. The board

---

*Formerly Rules on Appeal, rule 59(a).

found and the evidence shows that on May 14, 1954, Mrs. Hahn retained petitioner to represent her in the sale of certain real property. A few days later, petitioner prevailed upon Mrs. Hahn to sign various documents, including a deed conveying title to the real property to petitioner, as trustee for himself, Mrs. Hahn, and a third party, and a five-year option in petitioner's favor on the real property, for which he gave no consideration. Petitioner did not explain these documents to Mrs. Hahn, and she did not understand what they were.

Thereafter, petitioner sold an option on the real property, and later an extension of the option, for which he received $9,000. The option was never exercised. He entered into an agreement to sell the real property to a religious organization. The organization took possession, and invested $20,000 in the property, including payments on existing encumbrances. Petitioner then agreed to buy out the organization for $25,000. He failed to make payment as agreed. Over a period of nine months several extensions of time to make payment were agreed upon, and still petitioner failed to pay. At the end of that period, he persuaded the organization to accept $16,500 for its interest.

These transactions were entered into without the knowledge or consent of Mrs. Hahn. In October 1956 petitioner sold the property for $91,000. He wilfully failed and refused to render an accounting of the proceeds to Mrs. Hahn. Mrs. Hahn sued petitioner and obtained a $10,000 default judgment, and ultimately recovered $3,500 from the proceeds of the sale in escrow.

The evidence shows that petitioner disregarded his fiduciary duty to his client and assumed a position adverse to her in the sale of her property. He commingled funds he held as trustee with his personal funds. Because petitioner failed to keep records, the exact amount that he converted to his own use without his client's knowledge or consent cannot be determined. Even crediting the many unsubstantiated expenses claimed by petitioner, however, the board's finding that no less than $2,800 was so converted is sustained by the evidence.

In the second matter petitioner was retained by Melvin Hassler in April 1957 to prosecute a claim for personal injuries and property damage. The written retainer agreement provided that petitioner was to receive one-third of the amount recovered if the matter was settled without court action. No court action was instituted and in July 1957 the

matter was settled for $4,500. The insurer of the party obligated to pay sent petitioner a draft for $4,500 payable to Hassler, his insurer, and petitioner. Petitioner obtained the endorsement of Hassler and his insurer, and on July 26, 1957, negotiated the draft for cash at the Wilshire-Oxford Branch of the California Bank.

The board found and the evidence shows that petitioner thereafter converted the entire proceeds of the draft to his own use without the knowledge or consent of Hassler and without rendering an accounting to Hassler. Hassler made repeated unsuccessful efforts to collect the sum due him from petitioner. In April 1958 petitioner sent Hassler a check for $2,204 and a promissory note for the same amount. Neither the check nor the note were signed. Petitioner explained to Hassler a few days later that if Hassler wished to lend him the money, petitioner would sign the note, and if Hassler did not wish to lend the money, petitioner would sign the check. Hassler made no decision until August 1958, when he asked petitioner for the money. Petitioner said that he did not have the money available, but signed the check and asked Hassler to hold it for a few days. He said he would notify Hassler when the money was in the bank.

After waiting for a week or two weeks Hassler deposited the check. It was returned to him marked "refer to maker." He again asked petitioner for the money but did not receive it. In January 1959 petitioner sent Hassler a proposed agreement and asked him if he wished to invest the money due him in a radio station. Hassler did not sign the agreement. He complained to the State Bar in January 1960.

Petitioner claims that he paid Hassler a total of $2,750. There is no evidence to substantiate that claim. Even if it is true, however, petitioner admits that he paid Hassler nothing before 1959 and that in addition to the $2,750 he claims to have paid, $600 was due. By his own admission, therefore, the check he wrote for $2,204 in 1958, even had it been honored, was less than the amount he owed Hassler.

In the third matter, petitioner was employed in March 1959 to defend Kenneth W. Matthews in a criminal action in which Matthews was charged with issuing bad checks. Matthews informed petitioner that he believed the amount of his worthless checks held by the police was about $1,800. Petitioner suggested that Matthew's chances of probation would be increased if he made restitution prior to sentencing, and for that purpose Matthews requested $1,800 from his brother,

Teddie W. Matthews. Teddie turned over a check in that amount to petitioner, after telling petitioner that the funds were to be used only to redeem bad checks and were not to be delivered to Kenneth. Petitioner signed the following writing: "March 26, 1959. Received from Teddie W. Matthews $1800 Cashier's Check for payment on bad checks of Ken Matthews. An accounting is to be rendered to Teddie W. Matthews at close of Ken. Matthew's case. W. J. Hyland." Petitioner deposited the check in the Reseda Branch of the Bank of America, opening a new trust account under the name of "Wm. J. Hyland III, Trustee Account."

The evidence sustains the board's findings that petitioner thereafter wilfully commingled these trust funds with his own funds, that he wilfully misappropriated some of the trust funds, and that he wilfully failed to render an accounting to Teddie W. Matthews. In violation of the trust, petitioner gave Kenneth $250 of the trust fund. At least $55 of that sum was used for purposes other than redeeming bad checks. Petitioner appropriated $425 from the trust fund as his fee for representing Kenneth. Teddie did not consent to either appropriation, and only learned of them sometime after they occurred. Petitioner ignored Teddie's protests, and never met his demands for an accounting.

The evidence regarding the disposition of the balance of the trust fund is in conflict. Petitioner failed to produce any adequate records. His testimony on the matter is inconsistent in several respects and is contradicted by other evidence. The bank records and the testimony of Kenneth and another witness sustain the board's finding that petitioner wilfully converted and commingled with his own funds some $780 of the trust funds in addition to the $425 he took as his fee.

The fourth matter concerns petitioner's representation of Edward J. Preston in *Wyoming Pacific Oil Co.* v. *Preston*, an action filed in the Los Angeles County Superior Court in 1952. Preston retained petitioner in February or March 1955, shortly after service of the complaint upon him by the attorney for Wyoming Pacific. On March 16, 1955, Preston's default was entered in the *Wyoming Pacific* action. Petitioner learned of the entry of default sometime in March. He informed Preston that he would move to set aside the default, but in fact he did nothing. In the following months Preston frequently questioned petitioner about the status of the case, and on each occasion was told in substance that he

should let petitioner do the worrying, that petitioner was the lawyer, and that everything was under control.

In November 1957 Preston's default in the *Wyoming Pacific* action was proved and a $6,185,000 judgment against him was entered. The judgment was reported in the Los Angeles newspapers, and a friend of Preston's who read the article clipped it out and sent it to Preston in Montana. Preston immediately called petitioner. Petitioner was not aware of the judgment, but he assured Preston that he would take steps to have it vacated.

Petitioner at this time mistakenly believed that under section 473 of the Code of Civil Procedure the six-month period for setting aside a default ran from the entry of judgment. An associate of petitioner's, having noticed the newspaper report, researched the problem and discovered that contrary to petitioner's interpretation the time for setting aside a default under section 473 runs from the entry of default. Petitioner asked a second associate to research the problem, and that associate reached the same conclusion.

On November 29, 1957, petitioner met with Mr. and Mrs. Preston and another attorney. Petitioner announced that he had an ''ace in the hole'' because there had been no summons on the complaint served on Preston. Preston directed petitioner to move immediately to set aside the judgment, and petitioner assured him that he would.

Petitioner took no action to set aside the judgment before January 23, 1958. On that date, Preston learned from his attorney in Chicago that petitioner had done nothing about the judgment. On the same day, he notified petitioner by telegram that he was discharged. Although he knew he was discharged, petitioner on January 27, 1958, caused the filing of a complaint in Preston's name. Preston had not seen the complaint, but petitioner attached to it a verification that Preston previously had signed in blank at petitioner's request. The verification was notarized at petitioner's request by L. G. Wurst, an associate of petitioner's in an accounting business. Preston was in Chicago on the date of the purported notarization, and never appeared before Wurst.

Preston then retained a Los Angeles attorney to move to set aside the *Wyoming Pacific* judgment. Petitioner assured the attorney that there was no summons on the complaint when it was delivered to him, and that no alterations had been made to the complaint since it was delivered. Petitioner signed an affidavit to that effect. In reliance on petitioner's statement,

Preston signed a similar affidavit, though he had no independent recollection of the facts sworn to.

At the hearing on the motion to set aside the judgment petitioner testified that when he received the complaint from Preston there was no summons attached to it, that no alterations were subsequently made to it, that he did not affix a new blue backer to the complaint, and that the handwriting on the blue backer was not his. The judge ruled that a summons was attached to the complaint served upon Preston, and denied the motion to set aside the judgment. The order was affirmed on appeal. (*Wyoming Pacific Oil Co. v. Preston,* 171 Cal.App.2d 735 [341 P.2d 732].)

The Board of Governors found that petitioner wilfully disregarded Preston's instructions to take action in setting aside the default, that he falsely informed Preston that he was fully protecting Preston's interests, and that although petitioner did not wilfully misinterpret section 473 he did wilfully fail to formulate any ground for relief based upon mistake, inadvertence, surprise or excusable neglect. The board also found that petitioner acted as attorney for Preston after he knew he had been discharged, that he obtained Preston's signature on a blank verification, that the verification was used on a complaint filed by petitioner for Preston without Preston's knowledge, and that petitioner obtained a false notarization of the verification. These findings are supported by undisputed evidence.

The board also found that a summons was attached to the complaint served on Preston and delivered to petitioner, that thereafter the summons and blue backer were removed and a new blue backer bearing petitioner's handwriting was attached, and that petitioner was aware of these facts when he falsely testified to the contrary. These findings are sustained by the evidence. The attorney who served the complaint on Preston testified that a summons was attached. His secretary, who prepared and assembled the complaint and summons, testified that a summons was attached. One of petitioner's associates testified that when he observed the complaint in petitioner's files there was a summons attached. A handwriting expert testified that in his opinion the handwriting on the blue backer was petitioner's. From the time petitioner was hired until judgment was entered, he never mentioned that no summons was attached to the complaint, although he discussed the case with the attorney who served the complaint on Preston, and with his two associates, whose research in the

matter was based on the assumption that a summons was attached. In October 1956 petitioner sent a letter to Preston in which he stated his theory of the case and the alternative courses of action that were possible. The letter contains nothing to indicate that no summons was attached to the complaint. Petitioner attempted to explain away this evidence, but his testimony is not convincing. The explanations he offered were not only implausible but were contradicted by his testimony at the hearing on the motion to set aside the *Wyoming Pacific* judgment and by his testimony before the preliminary hearing committee in this proceeding.

The evidence in these four matters justifies the Board of Governors' recommendation that petitioner be disbarred. Each matter involves several acts of professional misconduct, and each is serious enough to justify disciplinary action. Together they show that within two years of his admission to the Bar petitioner fell into a pattern of misconduct that continued until these disciplinary proceedings began. The record reveals no extenuating circumstances. We agree with the board that petitioner cannot be recommended to the public as a person worthy of trust and that he therefore is not entitled to continue to practice law.

Petitioner also contends that the findings and recommendations of the Board of Governors should be set aside and the matter remanded for further hearings, on the ground that he was without funds to employ an attorney and the State Bar failed to appoint one to represent him.

Under section 6085 of the Business and Professions Code, petitioner was entitled to "a reasonable opportunity and right . . . [t]o be represented by counsel." Petitioner was afforded that right here. He represented himself in the hearings before the local administrative committee, and was represented by other counsel before the Board of Governors. He never indicated to the local committee that he wished to have counsel appointed for him. Hearings in these matters were held on 19 separate occasions over a period of 19 months. At the sixteenth hearing petitioner indicated that he was negotiating with two attorneys and would be represented by one of them at future hearings. At the seventeenth hearing he indicated that he could not pay the retainer demanded by the attorneys, and that he would therefore continue to represent himself. Although at that point the committee properly might have appointed counsel for petitioner, its failure to do so did not deprive him of "a reasonable opportunity" to

be represented. The committee reasonably concluded that petitioner preferred to represent himself. Having chosen to represent himself, petitioner cannot now, after an adverse result, assert for the first time that counsel should have been appointed for him.

Petitioner finally contends that this court should order further hearings before the State Bar in order that he may present evidence of his mental incompetence at the time of the offenses involved in these proceedings. In support of this contention petitioner alleges that from 1955 to 1960 he had marital difficulties that rendered him mentally incompetent; that in December 1960 he recovered completely; that his mental incompetence constitutes a valid defense to the charges against him; and that he did not present this defense at the local committee hearings because he was not then aware that it was a valid defense.

█ The purpose of a disciplinary proceeding under the State Bar Act is to protect the public, not to punish the offending attorney. (*Resner* v. *State Bar,* 53 Cal.2d 605, 613 [2 Cal.Rptr. 461, 349 P.2d 67]; *In re Rothrock,* 16 Cal.2d 449, 454 [106 P.2d 907, 131 A.L.R. 226].) The need for protection is the same whether or not the attorney is mentally incompetent. █ If, however, an attorney's mental incompetence renders him unable to form the intent that is an element of the offenses charged, then he should not be disciplined for the offenses, but should be prohibited from practicing law during the continuance of his mental incompetence. The appropriate remedy is not disbarment or suspension, but enrollment as an inactive member of the Bar, with the opportunity of becoming an active member upon a determination that mental competence has been restored. (Cf. Bus. & Prof. Code, § 6007.)

Even though mental incompetence is a defense in State Bar disciplinary proceedings, we conclude that the showing made by petitioner does not justify reopening hearings before the Board of Governors. █ Petitioner is not excused from presenting his defenses at the local committee hearings simply because he did not know mental incompetence was a defense. Mental incompetence has been considered in previous State Bar disciplinary proceedings, and petitioner is charged with knowledge of those cases. (See *In re Freiburghouse,* 52 Cal.2d 514, 515-516 [342 P.2d 1]; *Cane* v. *State Bar,* 14 Cal. 2d 597, 601 [95 P.2d 934].) Moreover, the Board of Governors granted petitioner an opportunity to support his alle-

gations of mental incompetence, and he failed to do so. On February 15, 1962, on motion of his counsel, petitioner was granted a 30-day extension to produce evidence in support of his allegations. The motion was supported by the affidavit of Dr. James Solomon, who stated that he had known petitioner for one year (1961), that during that period petitioner appeared to be "restless, agitated, tremulous, emotionally disturbed generally," and that further time was required for him to fully evaluate petitioner's mental condition.

Petitioner never presented further evidence to the board. On March 29, 1962, his counsel requested an extension of time because of "various problems." The request was denied. On April 19, 1962, the board determined the cases, and recommended disbarment. On May 26, 1962, petitioner again moved for an extension of time. He offered no evidence in support of his allegations and the request was denied.

The records in this case were filed with this court on August 14, 1962. After several extensions of time, counsel for petitioner on April 5, 1963, filed a brief in support of the petition for review filed on October 15, 1962. He has not filed any documents in support of his defense of mental incompetence. In view of the length of time petitioner has already had to substantiate his claims, we conclude that his allegations are specious and that no further time should be given.

It is ordered that the petitioner, William John Hyland III, be disbarred from the practice of law in this state and that his name be stricken from the roll of attorneys, effective 30 days after the filing of this opinion.