[S. F. No. 22295.   In Bank.   Dec. 15, 1966.]

TERENCE HALLINAN, Petitioner, v. COMMITTEE OF BAR EXAMINERS, THE STATE BAR OF CALIFORNIA, Respondent.

448

Garry, Dreyfus & McTernan and Benjamin Dreyfus for Petitioner.

Marshal W. Krause, A. L. Wirin, Fred Okrand and Lawrence R. Sperber as Amici Curiae on behalf of Petitioner.

Herman F. Selvin, Loeb & Loeb and Kenneth D. McCloskey for Respondent.

PETERS, J.—Petitioner, Terence Hallinan, seeks review of the action of the Committee of Bar Examiners in refusing to certify him to this court for admission to practice law in California. (Bus. & Prof. Code, § 6066.)

Petitioner, now aged 29, graduated from Hastings College of Law and in March 1965 took and passed the bar examination given general applicants. He was not certified for admission, however, pending investigation and hearing into his possession of the "good moral character" requisite for certification for admission.[1]

---

[1]Under Business and Professions Code section 6060 in order to qualify for certification an applicant must, among other things, "Be of good moral character." (Bus. & Prof. Code, § 6060, subd. (c).) Under the Rules Regulating Admission to Practice Law the burden of proving good moral character is upon the applicant. (Rule X, § 101; see also *In re Garland*, 219 Cal. 661, 662 [28 P.2d 354]; *Spears* v. *State Bar*, 211 Cal. 183, 188 [294 P. 697, 72 A.L.R. 923].) Pursuant to this rule the appli-

After lengthy hearings by a three-man subcommittee and a review of the entire record of those hearings and of additional evidence produced before the full Committee of Bar Examiners the latter found that petitioner did not possess the good moral character necessary for admission.

Respondent, by letter of April 21, 1966, advised petitioner "that this Committee does hereby refuse to certify the applicant to the Supreme Court of California for admission and a license to practice law because said applicant does not satisfy the requirement of Section 6060(c) of the California Business and Professions Code that he 'be of good moral character' . . . ." The letter set forth five grounds upon which this conclusion was based.[2]

■ The findings of the Board of Governors of the State Bar or of a committee such as respondent, while given great weight, are not binding upon this court. (*In re Alkow*, 64 Cal.2d 838, 840 [51 Cal.Rptr. 912, 415 P.2d 800]; *Grove* v. *State Bar*, 63 Cal.2d 312, 315 [46 Cal.Rptr. 513, 405 P.2d 553]; *Linnick* v. *State Bar*, 62 Cal.2d 17, 19 [41 Cal.Rptr. 1, 396 P.2d 33]; *Bodisco* v. *State Bar*, 58 Cal.2d 495, 497 [24 Cal.Rptr. 835, 374 P.2d 803]; *Werner* v. *State Bar*, 24 Cal.2d 611, 623 [150 P.2d 892].) ■ The burden of showing that the findings are not supported by the evidence or that its decision or action is erroneous or unlawful is upon the petitioner. (*In re Alkow, supra,* 64 Cal.2d at p. 840; *In re Clark,*

cant must initially furnish enough evidence of good moral character to establish a prima facie case, and the committee then has the opportunity to rebut that showing with evidence of bad character. (*Konigsberg* v. *State Bar of California,* 366 U.S. 36, 41 [6 L.Ed.2d 105, 81 S.Ct. 997].)

[2] These five grounds are as follows: "(1) he now has and has demonstrated over a period of many years, a continuing willingness and tendency, without reasonable justification, to employ against the persons and property of others unreasonable physical force and the threat thereof; (2) he has recently and continuously over a period of years shown disrespect and willful disregard for the rights, property, and physical safety of others; (3) in his improper and sometimes criminal use of force, the threat of force, and forceful resistance to arrest, and in his knowing disobedience of the order of a Court, he has shown a disrespect for the law and judicial officers, which exceeds the bounds of his acknowledged right to hold and espouse, to advocate, advertise, and to participate in mass demonstrations to achieve the acceptance of any social, political or philosophical views or beliefs in a peaceful and non-violent manner; (4) the record as a whole establishes that he lacks candor and truthfulness; and (5) the evidence in the record tending to show that he has good moral character is outweighed by the evidence that he is not entitled to the high regard and confidence of the public and that he does not possess those qualities of character and moral fitness requisite to admission to practice law in California." It should be noted, as pointed out later, that the subcommittee had based its findings solely on petitioner's beliefs and activities in connection with civil disobedience.

63 Cal.2d 610, 612 [47 Cal.Rptr. 681, 407 P.2d 993]; *Schullman* v. *State Bar*, 59 Cal.2d 590, 599 [30 Cal.Rptr. 834, 381 P.2d 658]; *Rock* v. *State Bar*, 57 Cal.2d 639, 642 [21 Cal.Rptr. 572, 371 P.2d 308, 96 A.L.R.2d 818]; *Hatch* v. *State Bar*, 55 Cal.2d 127, 128 [9 Cal.Rptr. 808, 357 P.2d 1064]; *Sullivan* v. *State Bar*, 50 Cal.2d 491, 501 [326 P.2d 138]; *Webb* v. *State Bar*, 47 Cal.2d 866, 868 [306 P.2d 458].)

In disciplinary proceedings this court examines and weighs the evidence and passes upon its sufficiency. (*Schullman* v. *State Bar, supra,* 59 Cal.2d 590, 599; *Bodisco* v. *State Bar, supra,* 58 Cal.2d 495, 497; *Black* v. *State Bar,* 57 Cal.2d 219, 222 [18 Cal.Rptr. 518, 368 P.2d 118]; *Best* v. *State Bar,* 57 Cal.2d 633, 635 [21 Cal.Rptr. 589, 371 P.2d 325]; *Rock* v. *State Bar, supra,* 57 Cal.2d 639, 642; *Sturr* v. *State Bar,* 52 Cal.2d 125, 127 [338 P.2d 897].) Any reasonable doubts encountered in the making of such an examination should be resolved in favor of the accused. (*Black* v. *State Bar, supra,* 57 Cal.2d 219, 222; *Brawner* v. *State Bar,* 48 Cal.2d 814, 818 [313 P.2d 1]; *Browne* v. *State Bar,* 45 Cal.2d 165, 168, 169 [287 P.2d 745]; *Hildebrand* v. *State Bar,* 18 Cal.2d 816, 834 [117 P.2d 860]; see also *Zitny* v. *State Bar,* 64 Cal.2d 787, 790 [51 Cal.Rptr. 825, 415 P.2d 521], and *In re Bar Association of San Francisco,* 185 Cal. 621, 623-624 [198 P. 7].) These rules are equally applicable to admission proceedings.

▉ There are some distinctions between admission proceedings and disciplinary proceedings, the essential one being that in the former the burden is upon the applicant to show that he is morally fit, whereas in the latter the burden is upon the State Bar to prove that an attorney is morally unfit. There is early authority for the proposition that the substantive standards and permissible scope of investigation in disciplinary proceedings are distinguishable in some respects from those which apply to an admission proceeding of the type here presented. It has been held, for example, that the inquiry into moral fitness in the admission process may be broader in scope than that in a disbarment proceeding. (*Spears* v. *State Bar, supra,* 211 Cal. 183, 188; *In re Wells,* 174 Cal. 467, 474-475 [163 P. 657]; see also *In re Stepsay,* 15 Cal.2d 71, 75 [98 P.2d 489].) It was stated in the *Wells* case, and subsequently reaffirmed in *Spears,* that in a proceeding for admission, ''The court may receive any evidence which tends to show . . . [the applicant's] character for honesty, integrity, and general morality, and may no doubt refuse admission upon proofs that

might not establish his guilt of any of the acts declared to be causes for disbarment." (174 Cal. at p. 475.)[3]

*Wells* and *Spears,* as well as other California cases approving denial of admission to the bar, have been cited to demonstrate that "good moral character" has traditionally been defined in this state "in terms of an absence of proven conduct or acts which have been historically considered as manifestations of 'moral turpitude.' "[4] (*Konigsberg* v. *State Bar,* 353 U.S. 252, 263 [1 L.Ed.2d 810, 77 S.Ct. 722]; see also *In re Meyerson,* 190 Md. 671 [59 A.2d 489, 490].) Since commission of an act constituting "moral turpitude" is a statutory ground for disbarment (Bus. & Prof. Code, § 6106) and is perhaps the most frequent subject of inquiry in disciplinary proceedings, it may readily be seen that, insofar as the scope of inquiry is concerned, the distinction between admission and disciplinary proceedings is today more apparent than real.[5]

[3]Stricter substantive and procedural requirements necessary to sustain an adverse decision in a disciplinary proceeding are frequently rationalized on the theory that an attorney has a vested property *right* in maintaining a practice already established, whereas an applicant for admission seeks merely to be accorded a *privilege.* (See Note, 65 Yale L.J. 873.) Thus, for example, the highest court in Connecticut stated in 1906 that, "To disbar an attorney is to deprive him of what, within the meaning of our constitutions of government, may fairly be regarded as property. [Citation.] But one who asks the privilege of admission to the bar is simply seeking to obtain a right of property which he has not got." (*In re O'Brien's Petition,* 79 Conn. 46 [63 A. 777, 780]. But see, generally, Reich, *The New Property,* 73 Yale L.J. 733.)

It seems somewhat difficult to maintain that an individual, like petitioner, who has invested considerable time, energy and expense in obtaining a legal education and who has demonstrated the requisite intellectual qualities and technical proficiencies does not thereby acquire at least the semblance of a right to be admitted to the profession similar to the right of an attorney already admitted to practice. In any event, opinions of the United States Supreme Court and of our court which characterize a claim for admission to the bar as a claim of a right entitled to the protections of procedural due process (*Willner* v. *Committee on Character,* 373 U.S. 96, 102 [10 L.Ed2d 224, 83 S.Ct. 1175]; *In re Summers,* 325 U.S. 561, 568 [89 L.Ed 1795, 65 S.Ct. 1307]; see also *Woodard* v. *State Bar,* 16 Cal.2d 755, 757 [108 P.2d 407]) make it impossible for us to regard admission to the profession as a mere privilege.

[4]"Moral turpitude," in turn, has been broadly defined as " 'everything done contrary to justice, honesty, modesty, or good morals' (*In re McAllister,* 14 Cal.2d 602, 603 [95 P.2d 932]; *In re Hatch,* 10 Cal.2d 147, 150 [73 P.2d 885]) and as '[a]n act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man' (*In re Boyd,* 48 Cal.2d 69, 70 [307 P.2d 625]; *In re Craig,* 12 Cal.2d 93, 97 [82 P.2d 442])." (*In re Alkow, supra,* 64 Cal.2d 838, at pp. 840-841.)

[5]Moreover, in *Schware* v. *Board of Bar Examiners,* 353 U.S. 232, 242 [1 L.Ed.2d 796, 77 S.Ct. 752, 64 A.L.R.2d 288], the United States Supreme Court appears to treat "moral turpitude" as the relevant criterion in reviewing a decision to refuse admission, even though the New

Fundamentally, the question involved in both situations is the same—is the applicant for admission or the attorney sought to be disciplined a fit and proper person to be permitted to practice law, and that usually turns upon whether he has committed or is likely to continue to commit acts of moral turpitude. At the time of oral argument the attorney for respondent frankly conceded that the test for admission and for discipline is and should be the same. We agree with this concession. ■ Therefore, in considering the kinds of acts which would justify excluding a candidate for admission we may look to acts which have been relied upon to sustain decisions to disbar or suspend individuals previously admitted to practice.

In order to sustain the burden of proving that he possesses good moral character, petitioner furnished the Committee of Bar Examiners adequate letters of recommendation from members of the State Bar, and introduced before the hearing subcommittee the testimony of other attorneys who knew him.

For example, a telegram from Judge Hector P. Baida, who presided over a trial in which petitioner defended himself against criminal charges stemming from his arrest during a civil rights demonstration, was introduced into evidence. In his telegram Judge Baida stated that petitioner ''represented himself throughout the proceedings of the court, applying the standards of conduct required of a member of bar. I can think of no part of his courtroom demeanor that would be subject to criticism.'' Frederick J. Whisman, the assistant district attorney who prosecuted the case, testified to substantially the same effect as Judge Baida's telegram.

J. Warren Madden, a professor of law at Hastings and a retired judge of the United States Court of Claims, sent a letter recommending petitioner to the Committee of Bar Examiners. He stated in the letter that petitioner was in the top 25 percent of his graduating class, that, while his contacts with petitioner ''were not extensive,'' he gained the ''impression that he was a quiet, serious and intelligent student''; that he, like any person who has passed the bar examination, ''has made a large investment of his years and his energy in pursuit of a worthy ambition,'' and that if admitted one of petitioner's principal activities would be ''representation of

Mexico statute, like our own statute, required a showing of good moral character on the part of the applicant. And in *Moura* v. *State Bar*, 18 Cal.2d 31, 32 [112 P.2d 629], this court used ''good moral character'' as the standard in a disbarment case.

persons whose beliefs are unorthodox or unpopular," for which type of case, Professor Madden went on to say, there has never been an adequate number of able and willing lawyers.

Joseph R. Grodin, a practicing attorney, taught a course in labor law at Hastings in which petitioner was enrolled. He testified that during that course he found petitioner to be "intelligent, alert, capable of dealing objectively with legal problems." Nothing in his classroom behavior, in Mr. Grodin's opinion, indicated anything which reflected negatively upon petitioner's qualification for the bar. The witness testified to his further opinion that petitioner "would make a very good lawyer."

State Assemblyman Willie Brown, also an attorney and with whom petitioner had worked in the civil rights movement, testified that there was nothing in petitioner's conduct in connection with the movement that would disqualify him from admission to the bar. John A. Burton, also a state assemblyman and an attorney, testified that he had worked with and observed petitioner in various political activities; that petitioner's conduct during those activities was peaceful; and that he knew of nothing that would disqualify petitioner from admission to the bar.

This evidence established a prima facie case on petitioner's behalf.[6] This is admitted by respondent.

The findings of the respondent disclose that the conclusion that petitioner "has a fixed and dominant propensity for lawlessness whenever violation of the law suits his purposes of the particular moment" was predicated on evidence relating to two distinct subjects of inquiry by the hearing committee: first, petitioner's participation in and attempts to justify certain acts of "civil disobedience" committed for the purpose of vindicating the civil rights of minority groups, particularly Negroes. Petitioner's participation in such acts of civil disobedience has resulted in various admitted and intentional violations of the criminal law for some of which he has been prosecuted and convicted. The second area of inquiry at the hearings concerned petitioner's alleged habitual and continuing resort to fisticuffs to settle personal differences. We discuss these two matters and their legal consequences separately.

---

[6]See *In re Stepsay, supra*, 15 Cal.2d 71, 76, quoting *Warbasse* v. *State Bar*, 219 Cal. 566, 571 [28 P.2d 19], with respect to the heavy weight given testimonials as to moral fitness from judges and attorneys.

First, as to petitioner's activities in connection with civil disobedience. His first arrest in this connection, so far as the record shows, occurred in 1960 while he was in England. At that time he participated in a peace demonstration in London allegedly involving "about a hundred thousand people." Immediately after the demonstration petitioner joined a group of 300 or 400 persons led by Bertrand Russell, a British philosopher, who attempted to deliver a letter of protest to the American Embassy. When the authorities at the embassy refused to accept the letter, the members of Lord Russell's group sat down en masse on a sidewalk on Grosvenor Square near the embassy. All such persons, including petitioner, were arrested. Petitioner was formally charged with "blocking a footpath" and fined one pound on his plea of *nolo contendere*.

After returning to the United States, petitioner's growing interest in the civil rights movement caused him to apply for membership in the Student Non-Violent Coordinating Committee (SNCC), an organization formed to carry out civil rights activities in the south. As a member of this organization he spent the summer of 1963 assisting in efforts to register Negroes to vote in Mississippi and to desegregate public facilities in that state. During this period, because of these activities, petitioner was twice arrested by local authorities in Mississippi, first for loitering, and subsequently for littering public areas. Neither arrest resulted in a conviction or even a trial. On both occasions petitioner was released from jail after intervention, after the first arrest, by the Attorney General of the United States, and, after the second, by the National Council of Churches.

When petitioner returned to San Francisco from Mississippi he became a member of the Congress of Racial Equality (CORE), the National Association for the Advancement of Colored People (NAACP), the Ad Hoc Committee to End Racial Discrimination, an organization affiliated with the United Freedom Movement, and helped to organize the W.E.B. DuBois Club, which is composed of young Socialists. As a member of these groups he expanded his participation in activities calculated to obtain civil rights for Negroes by direct action in the form of picketing and "sitting-in" at various business establishments in San Francisco believed to follow discriminatory business or hiring practices. Petitioner was arrested on six occasions by the San Francisco police between September 14, 1963, and April 11, 1964, for demonstrations at a private rental agency, at Mel's Drive-In Restaurant, at the

Sheraton Palace Hotel and at an automobile agency located on San Francisco's "auto row." Four of these six arrests were made for petitioner's participation in picketing and "sit-ins" on separate occasions at the Sheraton Palace and on "auto row." Petitioner was variously charged with violations of Penal Code sections 407 (unlawful assembly), 409 (remaining present at place of unlawful assembly), 415 (disturbing the peace), 602, subdivision (j), (trespass upon land for the purpose of obstructing a lawful business), 602.5 (unlawful entry), and 166, subdivision 4 (willful disobedience of a court order). The charges brought against petitioner for his role in the demonstrations at the rental agency, at Mel's Drive-In and for the picketing of the Sheraton Palace were dismissed. The charges stemming from the "sit-in" at the Sheraton Palace were dismissed on motion of the district attorney after two mistrials.

As a result of petitioner's two arrests on "auto row" he was twice tried and twice convicted on separate charges. He was convicted at the first trial on four counts of violating, respectively, Penal Code sections 407, 409, 415 and 602, subdivision (j), and, at the second trial, of three counts of violating Penal Code sections 407, 409 and 602.5, respectively. At the time of the hearing before the committee an appeal from the latter judgment of conviction was pending.

The so-called "auto row" "sit-ins" were the result of charges by the NAACP that certain automobile dealers adhered to and refused to negotiate about their claimed discriminatory hiring practices. At the first demonstration, on March 14, 1964, the demonstrators, including petitioner, entered the premises of the Cadillac agency, sat down and sang and clapped. The police arrived and the officer in charge read an order to the demonstrators requesting and directing them to leave the building in an orderly manner. Some of the demonstrators, but not petitioner, complied with the order. Those who remained in the building went limp and were carried out by the police and deposited in a patrol wagon. The only resistance offered by these demonstrators was passive. The second "sit-in" at the Cadillac agency occurred on April 11, 1964, after a "cooling-off" period failed to produce a settlement between the NAACP and the Cadillac dealers. The facts of this demonstration were substantially the same as the preceding one.

Petitioner did not deny his participation in these acts of civil disobedience, but justified his conduct by certain moral and political considerations. In this connection, he was inter-

rogated at great length by members of the subcommittee, often over repeated objections of petitioner's counsel that the questions called for speculative and philosophical answers that were unrelated to the determination whether petitioner possessed ''good moral character.''

Although the questions varied in form, petitioner was asked on numerous occasions whether, as an *abstract proposition*, he ever considered an individual justified in deliberately violating one law in order to force others to comply with another law or overriding constitutional principle.[7] On one of these occasions, for example, petitioner was asked, ''Well, with regard to the overriding consideration (and I understand that you feel that this is an overriding consideration) of civil rights and the United States Constitution, is it your position that you feel it proper to violate a law if this is necessary in order to gain these other ends? To enforce civil rights of other people.'' Petitioner responded as follows:

''I feel that there are instances where, when you have tried all the other resorts. . . . In other words, I wouldn't think it would be right for us just to go down to the Sheraton-Palace and sit down and say (you know) 'we are here to talk about hiring Negro employees'; but when we have tried to negotiate, when we have tried to picket and have tried all the other things and they won't even talk to us, I think then, in those circumstances, that the people are justified in going in and sitting-in. I think that really (and theoretically) they are not breaking the law. That is not a violation of the law. But I think, even if they should nonetheless be instructed and have to go to jail for it . . . if it was me [*sic*], I would be willing to do it. I mean, I guess I will eventually have to spend some time for what we did there at the Sheraton-Palace and the ''Auto Row'' and so on; but I feel that because it made so much progress in terms of the civil rights problem in this city, that I'm willing to pay the price for it. Even if it isn't reversed.''

Petitioner agreed that the traditional methods of securing changes in the law by instituting legal proceedings or petitioning the Legislature are preferable to attempting to do so through direct action in the form of civil disobedience. He also stated, however, that ''Unfortunately part of the progress of

---

[7]Similar questions were also asked of Assemblymen Willie Brown and John Burton who testified before the hearing committee in behalf of petitioner. Both were asked whether, in their opinion, ''you feel that it is proper for anyone to violate one law in order to force someone to comply with another?''

moving the legislature to do things has proved to be the necessity for some people committing acts of civil disobedience or sitting-in and picketing and singing and doing whatever you do. . . . that is, without the kind of direct activity and showing of feelings and so on, you won't get the legislature passing the laws. But unless you get the legislature passing the laws and changing the laws, then there is really no objective in all the mass civil disobedience and mass demonstrations and picket lines and everything else.''

In response to questions whether, in the event that he were admitted to the practice of law, he would advise others to break the law in order to secure desired changes, petitioner declared that he would not. He stated, in effect, that he would simply inform those who sought his advice whether any of their proposed acts would be violative of the law. He further indicated, however, that he would not interfere in a client's decision to violate intentionally the law for moral reasons after he had been advised as to the illegality of the proposed conduct. Petitioner also admitted that as an attorney he might well take part in a civil rights demonstration ''under certain circumstances.''

At one point in the hearings a member of the subcommittee read aloud to petitioner portions of an article deploring civil disobedience which appeared in the American Bar Association Journal.[8] Petitioner was asked to comment on the statement in the article that ''We must insist upon integrity of the means; we must support and protect the laws, whether we agree with a particular statute or not. We cannot settle for lip service to legality. We cannot be 'sometime' lawyers.''

Petitioner stated his disagreement with this statement, ''in the sense that I don't think [the author's] conclusion follows from the premises that he first lays out. That is, I don't think you are a ''sometime lawyer' because you won't obey every law to the 'T'. You know. I think, for example, lawyers in Germany during the second world war: It's an unfortunate thing that a lot more of them, particularly judges, didn't disobey these laws. In fact, they were punished and some of

---

[8]Leibman, *Civil Disobedience: A Threat To Our Law Society* (1965) 51 A.B.A.J. 645. Compare Tweed, Segal and Packer, *Civil Rights and Disobedience to Law: A Lawyer's View* (1964) 36 N.Y. State Bar J. 290, wherein the authors conclude, at page 295, that, ''Disobedience to law is always prima facie unjustifiable. It can be justified, as we have shown, particularly in situations in which obeying the law defeats the enjoyment of constitutionally guaranteed civil liberties. But the burden is always on the person who claims that his violation of law is legally justifiable.''

them even killed, for obeying the laws of the Third Reich.

"I think somebody in the southern part of the United States has an obligation—as a lawyer—has a duty, to disobey some of those laws that are really unconstitutional and that persecute people on the basis of their race and everything else. . . . I think that the kind of antithesis that the author of that article draws between the means and the ends is a false one. . . . Certainly nobody would hope to achieve a good end by some brutal means, because you just couldn't do it; but on the other hand, nobody would hope to achieve just a good end without any means. You have to have some means to get at them. And the reasons we have the laws on the books, the reason why today the Civil Rights Act was passed was because of what was happening in Selma—what was happening in Birmingham. . . . And it's only because of the activities, particularly of the Negro people, but a lot of their white supporters too, that a lot of those laws have been passed and that now it is possible to begin, but only to begin, talking about settling these things legally and in court, and not have to demonstrate and so on about it."

Does this type of evidence adequately support the refusal of respondent to certify petitioner for admission? We think not.

█ Preliminarily, we note that every intentional violation of the law is not, ipso facto, grounds for excluding an individual from membership in the legal profession. (See *In re Rothrock*, 16 Cal.2d 449 [106 P.2d 907, 131 A.L.R. 226], and *Baker* v. *Miller*, 236 Ind. 20 [138 N.E.2d 145, 59 A.L.R.2d 1393].) "There is certain conduct involving fraud, perjury, theft, embezzlement, and bribery where there is no question but that moral turpitude is involved. On the other hand, because the law does not always coincide exactly with principles of morality there are cases that are crimes that would not necessarily involve moral turpitude." (*Baker* v. *Miller, supra,* at p. 147.) In such cases, investigation into the circumstances surrounding the commission of the act must reveal some independent act beyond the bare fact of a criminal conviction to show that the act demonstrates moral unfitness and justifies exclusion or other disciplinary action by the bar. (*In re Hallinan*, 43 Cal.2d 243, 248 [272 P.2d 768].)

█ As the United States Supreme Court emphasized in *Schware* v. *Board of Bar Examiners, supra,* 353 U.S. 232, 239, "A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits

an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law. [Citations.] Obviously an applicant could not be excluded merely because he was a Republican or a Negro or a member of a particular church. ▮ Even in applying permissible standards, officers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards, or when their action is invidiously discriminatory. [Citation.]'' (See also *Konigsberg* v. *State Bar, supra,* 353 U.S. 252, 273.)

In addition to an arrest for suspicion of driving a stolen car, the petitioner in *Schware* had also been arrested at least twice on ''suspicion of criminal syndicalism'' in connection with a bitter labor dispute in which he participated, and once for violation of the Neutrality Act of 1917, which makes it unlawful for a person within the United States to join or to hire or retain another to join the army of any foreign state. In its evaluation of this evidence, the court first pointed out that Schware had never been indicted or convicted for any of the alleged offenses for which he had been arrested, but then further declared that ''the special facts surrounding . . . [Schware's 1934 arrests for criminal syndicalism] are relevant in shedding light on their present significance. Apparently great numbers of strikers were picked up by police in a series of arrests during the strike at San Pedro and many of these were charged with 'criminal syndicalism.' '' (353 U.S. at p. 241.) The court noted the absence of facts suggesting that Schware was using force or violence in an attempt to overthrow the state or national government. (*Schware* v. *Board of Bar Examiners, supra,* at pp. 241-242.)

Although Schware was never tried for violation of the Neutrality Act of 1917, the court stated that ''*even if it be assumed that the law was violated,* it does not seem that such an offense indicated moral turpitude—even in 1940. Many persons in this country actively supported the Spanish Loyalist Government. During the prelude to World War II many idealistic young men volunteered to help causes they believed right. It is commonly known that a number of Americans joined air squadrons and helped defend China and Great Britain prior to this country's entry into the war. . . . Few Americans would have regarded their conduct as evidence of moral turpitude. *In determining whether a person's character is good the nature of the offense which he has committed must be taken into account.*'' (353 U.S. at pp. 242-243.) (Italics added.) The court concluded that the arrests were wholly

insufficient to support a finding that Schware had bad moral character at the time he applied to take the bar examination.

Although not perfect in every respect,[9] there appears a clear analogy between the facts in *Schware* and those in the instant case. It should be emphasized that petitioner explicitly repudiated violent civil disobedience and that all of the demonstrations in which he engaged were peaceful. The sincerity of petitioner's beliefs in nonviolent civil disobedience and his high motivation in this regard are unchallenged by respondent. His sentiments on the qualified right of civil disobedience, however controversial, are shared, not only by large numbers of idealistic youth who have similarly demonstrated peacefully throughout our nation in recent years to protest suppression of the rights of Negroes, but also by some legal scholars[10] and other eminent people.[11]

▮ Whether these activities involve moral turpitude is dependent upon the issues involved and the motivation of the violator. Of course, we do not mean to condone disobedience of the law in any form; we mean only to express strong doubt that the leaders of current civil rights movements are today or will in the future be looked upon as persons so lacking in

---

[9]Unlike the instant case, all of Schware's arrests had been made a considerable time prior to the time he filed his application for admission to the State Bar of New Mexico.

[10]See, e.g., Freeman, *The Right of Protest and Civil Disobedience,* 41 Ind.L.J. 228; MacGuigan, *Civil Disobedience and Natural Law,* 11 Catholic Law. 118; Cohn, *The Firstness of the First Amendment,* 65 Yale L.J. 464, 478; Black, *The Problem of the Compatibility of Civil Disobedience With American Institutions of Government,* 43 Texas L.Rev. 492; Keeton, *The Morality of Civil Disobedience,* 43 Texas L.Rev. 507. After noting that "dissenters have been a feature of the American scene," the author of the last cited article states that, "Dissent has cost us dearly, but it has also enlarged our freedom and multiplied its fruits. Yet grievous injustices persist in our society, and important possibilities of human dignity and fulfillment remain unrealized. In so saying, we acknowledge that the law and the present social order are not seamless garments of right, but must be judged and altered in the light of moral standards external to the law. To reduce the present disparity between our ideals and our actual condition, we should once again draw upon our tradition of dissent. We should enlarge the role of civil disobedience and enhance its effectiveness for constructive change. To do so, we will require a fuller understanding than we have had of the requirements of responsible civil disobedience and of the conditions that can make its practice morally obligatory." (43 Texas L.Rev. at p. 507.) See also *Symposium, Civil Disobedience and the Law,* 3 Am.Crim.L.Q. 11; Law and Philosophy, a Symposium edited by Hook (1964) pt. I; cf. *Brown v. Louisiana,* 383 U.S. 131, 142 [15 L.Ed.2d 637, 86 S.Ct. 719], on "the right to protest."

[11]See, e.g., Thoreau on Civil Disobedience; Laski, The State in Theory and in Practice, pp. 65-66; M. K. Gandhi, The Story of My Experiments With Truth, pt. V, ch. 12; Plato, Republic, pt. VIII; Aristotle, Politics, pt. V.

moral qualifications that they should for that reason alone be prevented from entering their chosen profession.[12]

To the extent that acts of civil disobedience involve violations of the law it is altogether necessary and proper that the violators be punished. But criminal prosecution, not exclusion from the bar, is the appropriate means of punishing such offenders. ■■■ The purposes of investigation by the bar into an applicant's moral character should be limited to assurance that, if admitted, he will not obstruct the administration of justice or otherwise act unscrupulously in his capacity as an officer of the court. (See *Rosenthal* v. *State Bar Examining Committee*, 116 Conn. 409 [165 A. 211, 213, 87 A.L.R. 991]; *In re Eary* 134 W. Va. 204 [58 S.E.2d 647, 650]; *Curry* v. *Dahlberg* (Mo.) 112 S.W.2d 345, 346; *In re Farmer*, 191 N.C. 235 [131 S.E. 661, 663].) ■■■ We do not believe that petitioner's participation in the civil disobedience here shown can be characterized as involving moral turpitude. If we were to ·deny to every person who has engaged in a "sit-in" or other form of non-violent civil disobedience, and who has been convicted therefor, the right to enter a licensed profession, we would deprive the community of the services of many highly qualified persons of the highest moral courage. This should not be done.

The crimes with which petitioner has been charged, and in two cases convicted, in connection with his civil disobedience, considered together with the surrounding circumstances, are not analogous to the type of criminal charges or other acts which have been held to justify non-admission to the bar. (See, e.g., *In re Wells, supra,* 174 Cal. 467 [deviousness in bar application and obtaining credit through misrepresentation]; *Spears* v. *State Bar, supra,* 211 Cal. 183 [filing false statements in bar application]; *In re Garland, supra,* 219 Cal. 661 [forgery]; *In re Stover,* 65 Cal.App. 622 [224 P. 771] [cheating in dice games]; see also cases in other jurisdictions cited in 64 A.L.R.2d 301, §§ 6-17.)[13] The fraudulent acts charged in

---

[12]In *United States* v. *Francioso* (2d Cir. 1947) 164 F.2d 163, the court was called upon to interpret the phrase "good moral character" as contained in the Nationality Act (8 U.S.C.A. § 707, subd. (a)(3)) and stated that it established as a test whether "the moral feelings, now prevalent generally in this country" would "be outraged" by the conduct in question. See also *In re Hatch, supra,* 10 Cal.2d 147, 151, where it is stated that " 'The concept of moral turpitude depends upon the state of public morals, and may vary according to the community or the times.' "

[13]Nor are they similar to offenses involving intentional dishonesty for purposes of personal gain which have been held to warrant disbarment or suspension. (See cases cited in *In re Hallinan, supra,* 43 Cal.2d 243, at p. 248.)

all of the admission cases just cited, unlike the subject acts committed by petitioner, necessarily impair the basic objects of the legal profession; they demonstrate, in a variety of ways, moral turpitude that is conspicuously absent here. Petitioner's conduct is somewhat more analogous to activities recently the subject of our opinion in *Otsuka* v. *Hite*, 64 Cal.2d 596 [51 Cal.Rptr. 284, 414 P.2d 412]. It was held in that case that conscientious objectors who deliberately violated the Selective Service Act because of moral scruples and had as a result been convicted of a felony were not guilty of an "infamous" crime within the meaning of section 1 of article II of our Constitution, so as to be deprived of the right to vote. And a claim of exemption from military service on conscientious grounds, absent proof of disloyalty or insincerity, has been held not to justify exclusion from the bar. (*Application of Steinbugler*, 297 N.Y. 713 [77 N.E.2d 16]; cf. *Koster* v. *Holz*, 171 N.Y.S.2d 65 [3 N.Y.2d 639, 148 N.E.2d 287]; but see *In re Pontarelli*, 393 Ill. 310 [66 N.E.2d 83], and *Application of Brooks*, 57 Wn.2d 66 [355 P.2d 840].) It should also be pointed out that the petitioners in the *Otsuka* case had been convicted of felonies for their disobedience of federal law, whereas petitioner in the instant case has been convicted only of misdemeanors.[14]

Respondent's reliance upon *Application of Cassidy*, 296 N.Y. 926 [73 N.E.2d 41], is misplaced. In that case the Committee on Character and Fitness of the New York Bar by a vote of five-to-two certified the applicant for admission. The Appellate Division of the State Supreme Court, in a split decision, reversed on the ground that "The import of the documentary evidence established the applicant's belief in the resort to force to overthrow the existing form of government of the United States." (*Id.* at p. 41.) Respondent concedes that there is no such evidence in the present case.

*Repouille* v. *United States* (2d Cir. 1947) 165 F.2d 152, also relied upon by respondent, is not in point. That case involved a reluctant and technical holding, in a split decision, that a mercy killing by a father of a child destined to be an idiot and a physical monstrosity disqualified the father from admission

---

[14]That violation of the law should not per se disqualify an applicant for admission seems obvious even where such violation is intentional. Certainly willful violation of the traffic law standing alone is not sufficient to disqualify. Undergraduates who willfully violated the National Prohibition Law have never been denied admission. Hundreds of students participated in "sit-ins" in recent years. Assuming that this was a violation of law those students should not, because of that fact alone, be denied the privilege of practicing a licensed profession.

464

to citizenship for five years. The decision reversed the lower court which had admitted the father to citizenship. It is interesting to note that Judge Learned Hand's opinion for the majority appears to recognize the morality of civil disobedience.[15]

■ The additional evidence introduced by the State Bar which, it is claimed, tends to establish petitioner's alleged disregard for the law and his propensity for violence, consists of the testimony of various witnesses to nine fist fights in which petitioner was involved during the period from 1953 to 1964. All but three of these altercations occurred before 1959, at least six years prior to petitioner's application for admission, and can be classified as youthful indiscretions. As to the other three we are of the opinion that the explanations given by petitioner and his witnesses should be accepted.

Although the record is unclear as to the exact date, it appears that the last fight in which petitioner participated occurred in the fall of 1964 while he was a student in law school. Lois Herrington, a fellow student at Hastings, testified that when petitioner brought her home one night after a date he was suddenly attacked by a former suitor of hers who did not know petitioner, but who was jealous of his attentions to her, and had been lying in wait for their return to her apartment. After this unnamed individual struck petitioner, who according to the witness had been attempting merely to hold him off, petitioner struck back several times. When the police arrived at the scene they ascertained that petitioner had not provoked the attack and, presumably, had not otherwise acted unlawfully and therefore declined to take him or his attacker into custody. It is absurd to contend that this event in any way reflects on petitioner's good moral character.

In 1963 petitioner attended a Young Democrats convention in Bakersfield as a delegate of the Young Democrats chapter at Hastings. While he was in a café having coffee with a girl friend he noticed three other friends from Hastings engaged in an argument with some ''local toughs.'' The friends and their opponents went outside, while petitioner remained inside

---

[15] Judge Hand states (at p. 153), ''Many people—probably most people—do not make it a final ethical test of conduct that it shall not violate the law; few of us exact of ourselves or of others the unflinching obedience of a Socrates. There being no lawful means of accomplishing an end, which they believe to be righteous in itself, there have always been conscientious persons who feel no scruple in acting in defiance of a law which is repugnant to their personal convictions, and who even regard as martyrs those who suffer by doing so. In our own history it is only necessary to recall the Abolitionists.''

the café. But when he saw one of his friends struck by one of the locals and as a result have his face cut by his broken glasses, petitioner ran outside and intervened in the fight. Petitioner testified that he pulled his friend aside and told the other to "leave him alone." When the local swung at petitioner and told him to get out of the way, petitioner hit him until he indicated that he had had enough. Petitioner's testimony was the only evidence relating to this matter that was introduced before the hearing committee. It does not show moral turpitude.

In April 1962, petitioner and his brother Patrick were picketing in San Francisco in protest against the House Un-American Activities Committee. Ted Millard and David Moore, also students at Hastings, were "anti-picketing," that is, they were picketing the pickets. During the picketing Patrick stared at Millard, pointed to himself and said, "You and me." Millard replied, "Any time." Subsequently a fight between Patrick and Millard was arranged to take place in Golden Gate Park.

When the principals arrived at the designated spot they found a number of Hastings students gathered to watch. Petitioner, who had arrived with his brother, noticed that Millard's hands were taped and suspected that there might be something under the tape. During the fight between Patrick and Millard he stood close to the combatants in order that he might be able to stop the fight if it appeared that Millard's taped fists caused his brother undue harm. Moore, who had accompanied Millard to the scene, believed that petitioner's proximity to the combatants constituted a threat to Millard and stood next to petitioner so that he might prevent petitioner from interceding in behalf of his brother. Petitioner several times told Moore not to stand so close to him and Moore replied that he would stay close to petitioner so long as the latter remained close to the fighters.

Moore testified that he continued to remain close to petitioner and was suddenly hit by him on the jaw. Petitioner then allegedly started to hit Moore who countered with a wrestling hold, a "double-eight takedown," by which he took petitioner down. Moore suggested that it was ridiculous for them to continue fighting and they ought to quit, and petitioner allegedly agreed; when Moore released petitioner, however, the latter again attempted to strike him and Moore again countered with a takedown. This happened several times until Moore landed one punch that opened a cut above peti-

tioner's eye. They were then stopped by Millard and petitioner's brother. Petitioner's version of these events differs materially from Moore's. He emphatically denied Moore's statement that petitioner had "blind-sided" him. Petitioner stated that he had never hit anybody from the side when the recipient of the blow was not expecting it. Petitioner claimed that he hit Moore only after Moore disregarded his admonition to move away and had struck him over the eye in response to petitioner's pushing him away.[16] We do not think that this event shows such turpitude that petitioner should be deprived the privilege of practicing law.

The other fights all occurred more than six years prior to petitioner's application for admission to the bar, at times when he was between 16 and 22 years of age.

James Thalhamer testified that on the evening of June 1, 1959, he and some friends were walking back to their car in the parking lot of a bowling alley in Greenbrae. Thalhamer and his friends heard themselves called by a group of about 12 young men, among whom were several who Thalhamer knew from high school. As they turned around to face the group petitioner allegedly came up to Thalhamer's right side and hit him, breaking his jaw in two places and causing him to lose three teeth. Thalhamer stated that he tried to run away, but petitioner followed him, attempting to hit him again. Petitioner's version of the affair differed materially from Thalhamer's. Petitioner claimed that his fight with Thalhamer resulted when petitioner endeavored to prevent Thalhamer and several of his friends from attacking Richard Llewellyn, a friend of petitioner's.

As a consequence of this encounter, petitioner was indicted by the Grand Jury of Marin County for a violation of Penal Code section 245 (assault by means of force likely to produce great bodily injury). At trial the jury disagreed and was discharged. The district attorney later caused the indictment to be dismissed "in the interests of justice." Petitioner testified that the jury was unable to find him guilty because of the "fantastic story" invented by Thalhamer and the other prosecution witness, because these witnesses contradicted one another and because Delbert Smith, a friend of Thalhamer who was scheduled to testify for the prosecution, broke down at a lie-detector test. According to Thalhamer and his brother,

[16]Moore, Millard and Patrick Hallinan have been admitted to the bar since the events just described. No inquiry prior to their admission was made of any of them by the Bar Examiners concerning these altercations.

however, Smith's change of story and his failure to appear as a witness at the criminal trial were the result of fear induced by threats made by petitioner and his brothers. Prior to the dismissal of the criminal charge against petitioner, Thalhamer, through his guardian, brought a civil suit for damages against petitioner which was ultimately compromised out of court by the payment to Thalhamer of $5,000. It may be conceded that petitioner was here at fault, but this youthful brawl should not now disqualify petitioner from practicing law.

In the fall of 1957 petitioner and some friends attempted to enter a fraternity party being held at a private home in Marin County. Neither petitioner nor his companions were members of the fraternity. John Brough, a member of the fraternity, told petitioner and his friends that the party was a private affair and that they were not welcome. Brough testified that petitioner then hit him with sufficient force to knock his glasses off and force him up against a wall. Brough was then beset by another individual who was not petitioner. The police arrived soon after this affray, but no arrests were made nor did any criminal or civil litigation result.

Petitioner could not remember exactly what happened that night, nine years ago, but, to the best of his recollection, he had only pushed Brough in the course of an argument between Brough and one of petitioner's companions. Petitioner stated that his involvement in this melee was ''an obviously stupid thing''; that he and his friends should not have been there in the first place; and that he now regrets what he did. This melee was certainly ill-conceived. But we cannot hold that every youngster who crashes a party and gets into a fight should, years later, be denied the privilege of practicing law.

On a ski trip in March 1955 petitioner and three friends stopped at the Edelweiss Ski Lodge for coffee. When, after playing the juke box, they began to do a then popular dance step called the ''Bop,'' Kenneth Cotton, the proprietor of the establishment, asked them to leave, as he apparently deemed their dancing offensive. The group started to leave but did not do so before one of petitioner's friends challenged Cotton's right to put them out of his lodge. Petitioner stated that he took his friend's arm and said, ''Let's get out of here.'' At that point Cotton's wife ran up and slapped petitioner in the face. Mr. Cotton stepped between her and petitioner, and he, believing that Cotton was going to hit him, hit Cotton once or twice. The next day petitioner was taken into custody by the

468

local police and was charged in the Lake County Judicial District with violation of Penal Code sections 415 (disturbing the peace), 240 (assault), and 242 (battery). On the advice of his attorney, petitioner pleaded guilty to these charges. He was sentenced to three months in the county jail, which was suspended, and to pay a fine of $150.[17] This fight, which occurred 11 years ago, was inexcusable, but it does not represent such conduct as to justify denying petitioner the privilege of practicing law.

In May 1954, petitioner, his brother and a friend of the brother were driving near Shell Beach in Marin County. While petitioner's car was stopped at a stop sign a car passed them with three sailors in it. The sailors made an obscene gesture, causing petitioner to drive after them. The sailors pulled their car alongside the roadway after petitioner blew his horn. Petitioner got out of his car as did the driver of the other car and petitioner began "bawling" him out for having made the gesture. When the sailor took a swing at him, petitioner knocked him down and went back to the car and bawled out the other two sailors. When asked by these sailors what he wanted, petitioner replied he "just wanted to show you guys that you can't come around here doing things like this." The answer to that was, "Do you want some beer? There's some on the floor of the car. Take it." Petitioner saw several six-packs of beer on the floor, took some of it and then left.

A few days later, petitioner testified, he "was picked up for armed robbery or something." As a result of that arrest he was made a ward of the juvenile court for a period of years; his driver's license was suspended for three months; and he was fined in an amount not shown in the record. Immediately after the incident was over, petitioner thought it was a stupid thing to do; and he thinks so now. He declared that he would not repeat this type of conduct at the present time. This teenage brawl, while inexcusable, does not indicate an abandoned and malignant heart.

While seated in his car in a San Rafael drive-in in 1953, 13 years ago, Oliver Hartzell was approached by a group of seven youths, one of whom was petitioner. According to Hartzell, the

[17]Cotton brought a civil action against petitioner and recovered a $10,000 judgment, which award included both general and punitive damages. A new trial was granted unless the parties agreed to reduce the total judgment to $6,000. The parties failed to agree, and so the new trial was granted. The case was ultimately dismissed for the failure of Cotton to bring it to trial within the statutory period. The judgment of dismissal was affirmed. (*Cotton* v. *Hallinan*, 201 Cal.App.2d 415 [20 Cal. Rptr. 40].)

youths were "looking for a fight." He complained to the police that the group had damaged his car with kicks and blows. Hartzell, several police officers, and the seven youths went to the police station to discuss the matter. While there, the officers, after investigating a noise outside the station, discovered that the air had been let out of the tires on Hartzell's automobile. At the same time the seven youths scattered in all directions. They were soon rounded up, some of them being found in petitioner's car.

Petitioner's recollection of this incident was understandably "very hazy." One of his friends, who had come to the drive-in with him, had gotten into an "argument" or "altercation" with Hartzell and had as a result been picked up by the police. Petitioner and his companions went to the police station to see if they could help the friend. Petitioner denied that he was involved in damaging the car or in letting the air out of the tires. This was done by his friends, who were caught in the act and ran away. Petitioner did not think he ran away, but was unable to recall exactly.

There is some other evidence to which reference should be made. Several of petitioner's classmates testified that during his attendance at Hastings petitioner was seen on numerous occasions with a black eye or with cuts and bruises on his face or knuckles. Another classmate, however, testified that she had never seen petitioner in such a condition. Petitioner claimed that he was only in two fights while he was in law school: the fight with Moore and the one at the Young Democrats convention, and that in the latter fight he was not marked.

Most of these fights were inexcusable. Petitioner admitted this and expressed remorse for his behavior, stating that with maturity he had outgrown this pugnacious attitude. As to the three most recent fights, there was convincing and sometimes uncontradicted evidence of provocation and self-defense.

In addition, several witnesses offered reasonable explanations of petitioner's quarrelsome nature during his formative years. Thus Dr. Walter Beckh, the Hallinan family physician and a specialist in internal medicine, testified that he examined petitioner on July 9, 1959, and discovered "a marked degree of hypothyroidism" or thyroid deficiency. The witness stated that in many individuals, as in petitioner's case, such a glandular deficiency manifests itself through changed personality traits and behavior. Thus Dr. Beckh ascribed petitioner's short temper and impulsive nature to his thyroid deficiency. The physician believed his theory was confirmed by the obser-

vation that when petitioner took thyroxin tablets to cure the deficiency and its manifestations he at once became "more friendly" and "less ingrown." And when, for a brief period, petitioner neglected to take the tablets, he again became "real mean and short tempered."

Petitioner and his mother agreed with the testimony of Dr. Beckh that "there was a definite change in [petitioner's] personality when he started to take the thyroid." But it appears to be her feeling that the primary causes of her son's bellicosity lay in certain unique developments during the period of his adolescence. During this period petitioner's father, a prominent attorney, was becoming an increasingly controversial, if not a notorious figure in the community, as a result of his widely publicized and unorthodox political views (among other things, he ran for President as the candidate of the Independent Progressive Party) and his outspoken defense of various unpopular causes and individuals. Because of the controversy surrounding his father, petitioner experienced "social ostracism and isolation and unpopularity" while a student in grammar school. Occasionally he and his brothers were physically abused by older boys because of the political views associated with the Hallinan family. Petitioner testified for example, that one older brother was badly beaten up by three marines "because of our opposition to the Korean War." At this point petitioner's father gave his sons formal instruction and training in boxing. According to his wife, petitioner's father believed that, "If you are going to hold radical opinions, you have to be able to fight." According to Mrs. Hallinan, petitioner initially resisted the importuning of his father that he learn to fight. Once he reconciled himself to the alleged necessity, however, the training provided by his father converted petitioner into a formidable opponent—as is attested not only by the facts outlined above, but by the name by which he is regularly known: "Kayo" Hallinan.

It is of some significance that in its final report to the full Committee of Bar Examiners, in which it was recommended that petitioner not be certified for admission, the subcommittee which conducted all but one of the hearings into petitioner's moral character and which heard and saw the vast majority of the witnesses who testified, disregarded the evidence relating to petitioner's tendency to resort to the use of his fists to settle personal differences. The subcommittee based its recommendation *solely* on the evidence concerning his participation in acts of civil disobedience and beliefs as to the efficacy of non-violent civil disobedience. After an independent examination

of the record, we are in agreement with the apparent belief of the members of the subcommittee that the evidence of petitioner's intemperate resort to fisticuffs, however censurable, does not support the conclusion that he lacks the good moral character requisite to admission. The question is not whether petitioner's conduct can be condoned. It cannot. The question is whether such conduct demonstrates that he does not presently possess the character to be entitled to practice law. We think that it does not.

The majority of the fights in which petitioner has engaged occurred many years prior to the filing of his application for admission. They can be properly classified as adolescent behavior. (Cf. *Dudney* v. *State Bar*, 214 Cal. 238, 240 [4 P.2d 770], where the court indicates that "youth and inexperience" may be mitigating circumstances.) The three most recent fights, even if we ignore the evidence of provocation or other extenuating circumstances, all of which occurred after 1959, do not demonstrate such "baseness, vileness and depravity" as to amount to moral turpitude.

The nature of these acts, moreover, does not bear a direct relationship to petitioner's fitness to practice law. Virtually all of the admission and disciplinary cases in which we have upheld decisions of the State Bar to refuse to admit applicants or to disbar, suspend or otherwise censure members of the bar have involved acts which bear upon the individual's manifest dishonesty and thereby provide a reasonable basis for the conclusion that the applicant or attorney cannot be relied upon to fulfill the moral obligations incumbent upon members of the legal profession. (See, e.g., *Noland* v. *State Bar*, 63 Cal.2d 298 [46 Cal.Rptr. 305, 405 P.2d 129] [tampering with selection of potential jurors]; *Call* v. *State Bar*, 45 Cal.2d 104 [287 P.2d 761] [fraud]; *Werner* v. *State Bar*, *supra*, 24 Cal.2d 611 [bribery and grand theft]; *Bryant* v. *State Bar*, 21 Cal.2d 285 [131 P.2d 523] [complicity in usurious transaction]; *Stephens* v. *State Bar*, 19 Cal.2d 580 [122 P.2d 549] [misrepresentation]; *Bruns* v. *State Bar*, 18 Cal.2d 667 [117 P.2d 327] [taking money under false pretenses]; *Moura* v. *State Bar*, *supra*, 18 Cal.2d 31 [misappropriation of client's funds]; *Suspension of Hickman*, 18 Cal.2d 71 [113 P.2d 1] [grand theft]; *Stanford* v. *State Bar*, 15 Cal.2d 721 [104 P.2d 635] [misuse of trust funds]; *Barton* v. *State Bar*, 2 Cal.2d 294 [40 P.2d 502] [attempted extortion]; *Jacobs* v. *State Bar*, 219 Cal. 59 [25 P.2d 401], and *Lantz* v. *State Bar*, 212 Cal. 213 [298 P. 497] [violations of fiduciary responsibility]; *Spears* v.

*State Bar, supra,* 211 Cal. 183 [forgery] ; *In re Cruickshank,* 47 Cal.App. 496 [190 P. 1038] [embezzlement].) Although petitioner's past behavior may not be praiseworthy it does not reflect upon his honesty and veracity nor does it show him unfit for the proper discharge of the duties of an attorney. (Cf. *Barsky* v. *Board of Regents,* 347 U.S. 442, 470 [98 L.Ed. 829, 74 S.Ct. 650] (dissenting opinion of Frankfurter, J.).)

Thus, as was said in *State* v. *Metcalfe,* 204 Iowa 123 [214 N.W. 874], "A quarrelsome disposition, a hasty and ungoverned temper, and even an unwarranted assertion, under provocation, of a claimed right of defense of self or property, are not necessarily incompatible with truthfulness, faithfulness, and integrity." (*Id.,* at p. 876 [214 N.W.].)

In the case of *In re Rothrock, supra,* 16 Cal.2d 449, it was held that a conviction upon a plea of guilty to the charge of assault with a deadly weapon did not reflect upon the petitioner's moral fitness to practice law and would not, therefore, warrant his disbarment. It is difficult to believe that petitioner's far less reprehensible conduct reflects any greater unfitness and should justify any graver consequences.

It is also relevant to the issue of petitioner's present propensity for violence to point out that since 1963, when he first became active in the civil rights movement, petitioner has repudiated the use of force as a political principle. In none of the acts of civil disobedience previously described did petitioner resort to violence. His peaceful conduct in situations fraught with tension which might be expected to provoke to violence an individual so predisposed is some indication that petitioner has, in fact, overcome such a propensity.

*In re Farmer, supra,* 191 N.C. 235 [131 S.E. 661], and *Ex parte Keeley* (Ore.) 189 P. 885, early out-of-state cases relied upon by respondent, are not persuasive. In *Farmer* the applicant had pleaded guilty to offenses which demonstrated his inability to perform his duties as a law enforcement officer and were thus related to his capacity to fulfill the duties of an attorney. *Keeley* involved a California attorney seeking admission to practice in Oregon. The investigating committee of the Oregon Bar declined to recommend him on the basis of threats he had made to other lawyers while practicing in Oregon on a temporary license. The committee seems also to have based its decision largely on the applicant's statements and demeanor at the hearing. Among other things, Keeley taunted the secretary of the Bar Association about a personal affliction, and insinuated that his conduct was unprofessional. The opinion in *Keeley* shows that the court believed that the applicant's

turbulent and intemperate nature was intimately and directly connected with his fitness and capacity to practice law. We do not find that the facts in the instant case support a similar conclusion.

Respondent's contention and finding that petitioner lacks candor and truthfulness is based on such attenuated evidence that it is unnecessary to discuss this matter at length. This conclusion is based on petitioner's failure to mention in his application that he was an intervener in a will contest pending in the superior court and that he had been convicted in England in 1960 of the crime of blocking a footpath and fined one pound.

As to the will contest, petitioner testified that he was only a nominal party, acting for his father who had acquired the cause of action in petitioner's name. Petitioner signed a number of papers in the action at his father's request without paying any attention to or reading them. Petitioner stated that he failed to list his role in this action simply because he did not think of it. His father testified to substantially the same effect. Similarly, petitioner stated that the reason he neglected to disclose his arrest in England was that he "forgot all about it completely."

In view of the extensive list of arrests which petitioner did include in his bar application, his failure to disclose the arrest in England and his nominal role in the will contest must be regarded as *de minimis*. Certainly, in view of all the admitted arrests, petitioner's nondisclosure of these two relatively unimportant matters could not reasonably have been motivated by the belief that disclosure would harm his cause. In a similar California case unintentional nondisclosure has been held not to justify exclusion from the bar. (*In re Hovey*, 7 Cal.Unrep. 203, 210 [81 P. 1019].)

Other contentions of respondent so lack merit that no discussion is required.

After reading the entire record, and exercising our independent judgment as to the weight of the evidence, we find that the conclusion of the Committee of Bar Examiners that petitioner does not possess the good moral character required of applicants for admission to the bar is not justified by the record, and to the contrary we find that the record demonstrates that petitioner possesses such character. This being so, being qualified in all respects, petitioner is entitled to be admitted to practice law.

It is ordered that the Committee of Bar Examiners certify

petitioner to this court as one qualified to be admitted to practice law.

Traynor, C. J., Tobriner, J., Peek, J., Mosk, J., and Burke, J., concurred.

McCOMB, J.—I dissent. An examination of the record and a reading of the majority opinion discloses to me ample evidence to sustain the action of respondent in refusing to certify petitioner to this court for admission to practice law in California.

An attorney's oath requires him "to support the Constitution of the United States and the Constitution of the State of California, and faithfully to discharge the duties of any [sic] attorney at law. . . ." (Bus. & Prof. Code, § 6067.) It is the duty of an attorney to support the Constitution and laws of the United States and of this State. (Bus. & Prof. Code, § 6068, subd. (a).) At one time petitioner stated that he would take the oath without reservation and would observe it; on the other hand, he stated that everybody has an obligation to uphold the law "to a certain extent," and that there are some laws that are manifestly unjust which he didn't think anybody had an obligation to uphold. The record discloses that petitioner believes and acts upon the belief that it is right to violate the law in order to achieve some end strongly believed by him to be socially or politically desirable.[1]

One of the grounds for respondent's refusal to certify petitioner was that "the record as a whole establishes that he lacks

---

[1] As the majority opinion points out, p. 457), petitioner was asked, "Well, with regard to the overriding consideration (and I understand that you feel that this is an overriding consideration) of civil rights and the United States Constitution, is it your position that you feel it proper to violate a law if this is necessary in order to gain these other ends? To enforce civil rights of other people." Petitioner responded as follows:

"I feel that there are instances where, when you have tried all the other resorts . . . In other words, I wouldn't think it would be right for us just to go down to the Sheraton-Palace and sit down and say (you know) 'We are here to talk about hiring Negro employees'; but when we have tried to negotiate, when we have tried to picket and have tried all the other things and they won't even talk to us, I think then, in those circumstances, that the people are justified in going in and sitting-in. I think that really (and theoretically) they are not breaking the law. That is not a violation of the law. But I think, even if they should nonetheless be instructed and have to go to jail for it . . . if it was me, I would be willing to do it. I mean, I guess I will eventually have to spend some time for what we did there at the Sheraton-Palace and the 'Auto Row' and so on; but I feel that because it made so much progress in terms of the civil rights problem in this city, that I'm willing to pay that price for it. Even if it isn't reversed."

candor and truthfulness.'' The majority is of the opinion that since petitioner revealed an extensive list of arrests, his failure to make complete disclosure of all the facts called for on his application for permission to take the bar examination must be regarded as *de minimis*. In my opinion, the members of the subcommittee and the Committee of Bar Examiners before whom petitioner appeared were in a better position than we are to pass upon the truthfulness of his testimony, and I agree with their recommendation.